[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 457 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 458 
The opinion of January 21, 2000, is withdrawn, and the following opinion is substituted therefor.
This case arises out of a sale of real estate and requires us to examine the various duties owed to prospective buyers in real-estate transactions.
The real estate involved is a 2600-acre tract, known as the Comer Plantation, located in Barbour County. Harry Fisher negotiated for the purchase of the plantation; he paid $50,000 in earnest money, but later sought to rescind the contract of purchase and get a refund of his earnest money. When he failed in those attempts, he sued Comer Plantation, Inc. (the entity that owned the tract); its stockholders; Alabama Land Locators ("Locators"), a real-estate brokerage firm; and others, including Roger Pugh, who had done an appraisal on the property; Tim Speaks, an agent for Locators; and Paul Thomas, the owner of Locators and a stockholder in Comer Plantation, Inc.
The trial court entered a summary judgment for each defendant. The plaintiff appealed. We reverse as to the claims alleging suppression and breach of fiduciary duty against Speaks, Thomas, and Locators, and as to the claim alleging a breach of fiduciary duty by Locators as an escrow agent. We affirm the summary judgments on all remaining claims.
The record before us, viewed in the light most favorable to the plaintiff, suggests the following facts: In early 1995, Harry Fisher, a lawyer from Troy, North Carolina, developed an interest in Alabama real estate after going on numerous hunting trips throughout the State. Because Fisher knew nothing about Alabama real-estate markets, he contacted Locators for assistance. He telephoned the firm and left his name and telephone number and asked that someone contact him.
Tim Speaks, an agent for Locators, returned Fisher's telephone call. Fisher told Speaks about the kind of property he was looking for and speculated on potential uses for it. After that initial conversation, Speaks sent Fisher information regarding various properties, including Comer Plantation, a 2600-acre antebellum plantation located in Barbour County. Speaks told Fisher that this property best accommodated Fisher's potential needs. Speaks told Fisher that Comer Plantation had been on the market for a long time and that the sellers would probably accept a price that Fisher would find reasonable. Speaks then invited Fisher to visit Comer Plantation and inspect the property. Fisher agreed.
Speaks made all the appropriate arrangements for Fisher's visit, including arrangements for accommodations and transportation to Comer Plantation. *Page 459 
When Fisher first arrived at the hotel, Speaks provided him with a real-estate appraisal that had been prepared by Roger Pugh for the benefit of Paul Thomas, who was the owner of Locators and a stockholder in Comer Plantation, Inc. The report, addressed to SouthTrust Bank, estimated the value of Comer Plantation to be $919,000. Speaks advised Fisher to read the entire report and to bring it with him when he looked at the property.
The following morning, Speaks took Fisher on a tour of the property, and Fisher saw that the property needed extensive work in order to be usable. Many of the roads were impassable, primarily because of washouts and a need for culverts. Many of the structures on the property, including antiquated tenant houses, a windmill, a smokehouse, and other structures dating back to the antebellum period, were in complete disrepair. Pugh's appraisal listed the aggregate value of these structures as $20,000, which Speaks represented to Fisher to be a correct figure. There was also a man-made lake that had yet to be completed and filled with water. When Fisher asked Speaks about these problems, Speaks advised him to make an offer on the property "as-is." Speaks again told him that the owners wanted to sell the property as soon as they could.
That night, when Speaks and Fisher returned to the hotel, Speaks suggested that Fisher should offer between $500,000 and $600,000 for the property "as-is." Fisher considered what Speaks told him and formulated an offer based on the appraisal and on his inspection of the land. After a second day of inspecting the property, Speaks introduced Fisher to Paul Thomas. Speaks, however, never told Fisher that Thomas was also his employer.
The meeting was short and spirited. Fisher offered $500,000 for the property "as-is." Thomas refused to take the offer to the other owners. Fisher suggested that they should reduce the offer to writing, but Thomas abruptly said that there was no need to do so because the other owners would never consider it. When Thomas left, Speaks apologized for Thomas's conduct and said that he was going to talk with other owners who, he said, were more influential. Fisher responded by saying that he was no longer interested in the property, and he returned to North Carolina.
Days later, Billy Pritchard, a Birmingham lawyer who was also a stockholder in Comer Plantation, Inc., telephoned Fisher, apologized for Thomas's conduct, and told Fisher that he was the only true representative of the owners in regard to a sale. He told Fisher that he — Pritchard — would like to sell the property, but not "as-is," if Fisher was still interested.
Fisher soon began to negotiate with Pritchard. According to Fisher, Pugh's appraisal was the foundation for the negotiations. In arriving at an agreeable price, Fisher and Pritchard started at the full-appraisal figure, $919,000, and made deductions where both agreed deductions were appropriate. Fisher testified that he believed that $919,000 represented the true market value of Comer Plantation, and that because Pritchard clearly relied on that figure as the starting price, he thought that Pritchard also believed that it represented the true market value.
Speaks had an active part in making the sales contract. On Fisher's behalf, he negotiated for the owners to provide culvert pipes to repair the damaged roads on the property. Originally, Pritchard had wanted Fisher to pay for the cost of the pipes, but Speaks talked Pritchard into providing them free of charge. Speaks also helped Fisher by providing information, advice, and general assistance throughout the negotiations.
Eventually, Fisher and Pritchard agreed on a price of $710,000. Pritchard sent Fisher a contract, which he signed and returned. Pursuant to the contract, Fisher tendered a check for $50,000 earnest *Page 460 
money to be deposited in an escrow account maintained by Locators.
Days after the execution of the contract, Fisher sent Pugh's appraisal to Jimmy Preslar, his personal banker in North Carolina, to obtain financing. Preslar checked the arithmetic used in the appraisal and discovered an error in addition that had caused the estimate to be nearly $100,000 greater than the underlying numbers supported. Fisher immediately telephoned Pritchard, notified him of the error, and told him that he no longer wished to be bound by the contract because, he said, the negotiations had been premised on a faulty estimate. Fisher also demanded the return of his $50,000. Pritchard checked the appraisal, confirmed the error, and promised to investigate it.
Later that day, Pugh telephoned Fisher and offered an explanation for the error. Pugh said that while $919,000 was the correct total value of the property, the estimate of the value of the other improvements — including the unusable tenant houses, the decaying windmill, the smokehouse, and other structures built over 150 years ago — had been incorrectly stated as approximately $20,000 when it should have been nearly $120,000. Pugh claimed the error was typographical. Fisher questioned the explanation. The error convinced Fisher that he should withdraw from the contract. He again demanded the return of his $50,000, but Speaks refused to return it.
Comer Plantation, Inc., and its stockholders, on May 5, 1995, filed a declaratory-judgment action in the Jefferson Circuit Court, against Locators. Fisher was not notified of that Jefferson County action and did not discover that it had been filed and adjudicated until after discovery in the present case had commenced. The Jefferson Circuit Court held that the contract had been breached and ordered that the $50,000 be disbursed among the owners of Comer Plantation. Consequently, the $50,000 was removed from escrow and was distributed to the owners of Comer Plantation, which included Thomas, according to the terms of the order.
Subsequently, Fisher filed this lawsuit to recover the $50,000 down payment and to recover other damages, based on claims of fraudulent misrepresentation, suppression, breach of fiduciary duty, and negligence. Most of the issues presented in this case are affected by the relationship that Fisher, as a prospective purchaser of real estate, had with each defendant. We will therefore address the merits of each claim and the issues presented as they apply to each defendant.
 I.
Our scope of review in regard to a summary judgment has been frequently stated. "In reviewing the disposition of a motion for summary judgment, we utilize the same standard . . . the trial court [used] in determining whether the evidence before [it] made out a genuine issue of material fact" and whether the movant was "entitled to a judgment as a matter of law." Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988) (citingChiniche v. Smith, 374 So.2d 872 (Ala. 1979)); Rule 56(c) Ala.R.Civ.P. The movant has the burden of "showing material facts, which, if uncontested, entitle the movant to [a] judgment as a matter of law."Berner v. Caldwell, 543 So.2d 686, 688 (Ala. 1989); Woodham v. NationwideLife Ins. Co., 349 So.2d 1110, 1111 (Ala. 1977). Once the movant has made this showing, the opposing party then has the burden of presenting evidence creating a genuine issue of material fact. Danford v. Arnold,582 So.2d 545, 546 (Ala. 1991); Bass v. SouthTrust Bank of BaldwinCounty, 538 So.2d 794, 797-98 (Ala. 1989). Moreover, the nonmovant has the burden of establishing the existence of a genuine issue of material fact, by substantial evidence. Ala. Code 1975, § 12-21-12; Bass v.SouthTrust Bank of Baldwin County, supra. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment *Page 461 
can reasonably infer the existence of the fact sought to be proved."West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989).
Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie,Inc., 564 So.2d 412, 413 (Ala. 1990); Harrell v. Reynolds Metals Co.,495 So.2d 1381, 1383 (Ala. 1986); Wilson v. Brown, 496 So.2d 756, 758
(Ala. 1986).
 II. Fisher's Claims Against Pugh
Fisher alleged that Pugh had negligently or wantonly misrepresented and suppressed facts. We need to consider only Fisher's claims of negligent or wanton misrepresentation.[1]
The threshold question we must consider appears to be one of first impression: When and under what circumstances can a real-estate appraiser be held liable to a third party for a negligent misrepresentation in an appraisal? Insofar as we can tell, that precise issue has not been addressed by Alabama courts, although this Court has held that accountants may be liable to third parties under a theory of negligent misrepresentation if certain circumstances exist. See Boykinv. Arthur Andersen Co., 639 So.2d 504 (Ala. 1994); see also ColonialBank of Alabama v. Ridley Schweigart, 551 So.2d 390 (Ala. 1989).
In Boykin v. Arthur Andersen Co., this Court adopted Restatement(Second) of Torts § 552 (1977) as the law of this State in cases involving negligent misrepresentations relied upon by third parties, or parties who were not in privity of contract with the person making the misrepresentation. Boykin, 639 So.2d at 509-10. Restatement § 552 reads as follows:
 "(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
 "(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
 "(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
 "(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
 "(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them."
Restatement (Second) of Torts § 552 (1977). While we have applied this rule only to accountants, nothing in our prior cases should be understood as restricting our application of the Restatement approach to that one class of professionals. *Page 462 
The rule of § 552 may be applied to anyone who in the course of his "business, profession or employment" engages in an activity that meets the requirements set forth in Subsection (1). Comment c to § 552 states that this rule "subjects to liability only such persons as make it a part of their business or profession to supply information for the guidance of others in their business transactions." Section 552 would clearly, by its terms, govern real-estate appraisers, who, as an integral part of their business, facilitate real-estate transactions by issuing opinions regarding the value of real property.[2] These opinions usually influence the decisions of persons or entities to whom they are furnished. These persons or entities include banks considering whether to lend money to finance a real-estate purchase and buyers and sellers trying to determine an accurate price for real-estate. We therefore hold that real-estate appraisers are subject to liability for negligent or wanton misrepresentation, on the same basis that accountants are.
We now consider whether, based on the facts suggested by the record, Pugh owed Fisher a duty the breach of which would be actionable. We noted that the Restatement's definition of "duty" in negligent-misrepresentation cases limits the defendant's liability to "specifically foreseen and limited groups of third parties for whose benefit and guidance the [defendant] supplied the financial information and who used it as the [defendant] intended it to be used." Boykin, 639 So.2d at 510. Under the Restatement rule, as applied to the facts of this case, Fisher would have the burden of showing that Pugh, the appraiser, foresaw, or should have foreseen, that his appraisal would be relied upon by a limited class that included Fisher. The Restatement
rule, if applied to appraisers generally, would impose on an appraiser a duty to third parties that the appraiser intended to influence, as well as any party that the appraiser knew his client intended to influence by means of the appraisal. See First Nat'l Bank of Commerce v. MoncoAgency, Inc., 911 F.2d 1053, 1059 (5th Cir. 1990) (quoted by Boykin, 639 So.2d at 510). The Restatement rule, however, does not require, for the imposition of a duty, that one making a representation through a report or appraisal contemplate the specific identity of the person who may rely on the representation. Fisher argues that Pugh should have known that Locators would distribute the appraisal to prospective purchasers of Comer Plantation, given Pugh's extensive experience in the real-estate industry. Fisher also argues that an affidavit made by Charles Arrington, a professional Alabama real-estate broker with 25 years' experience, should not have been stricken as inadmissible but should have been considered by the trial court as evidence indicating that Pugh owed Fisher a duty.
These arguments, however, ignore the undisputed fact that the appraisal report was issued for the benefit of Thomas in his individual capacity rather than as a representative of his real-estate firm. Given that fact, we must conclude that Fisher's argument would impose on Pugh a duty that goes beyond that established by the Restatement rule and the cases interpreting it, and that Fisher failed to present evidence sufficient to support an inference that Pugh foresaw, or should have foreseen, that his appraisal would be used by prospective purchasers. *Page 463 
Pugh's report contains a statement, entitled "Assumptions and Limiting Conditions," that describes the intended use of the document. It expressly provides that the report may not be used for any purpose other than its "intended use" without the permission of the appraiser. "Intended use" has several meanings, depending on the context in which the report is provided, but based on the facts of this case, we cannot accept Fisher's argument that these facts satisfy the Restatement rule for the imposition of a duty to him. Suffice it to say that in this case, no evidence suggests Pugh knew, or should have known, that Thomas, in his capacity as an owner of Comer Plantation, was going to distribute the appraisal report to prospective purchasers. The evidence presented by Fisher, including Arrington's stricken affidavit, is irrelevant. Pugh stated in his deposition that he prepared the appraisal report solely for Thomas as a partial owner of Comer Plantation. Fisher presented no evidence to the contrary. Without evidence showing that Pugh knew, or should have known, that Thomas, as an owner and potential seller, was going to use the report as a selling tool, we cannot conclude that Pugh could be held liable for breach of a duty to Fisher.
We must conclude that the evidence does not create a genuine issue of material fact as to whether Pugh owed Fisher a duty. "[B]ecause liability for negligence and wantonness is predicated upon the existence of a duty," Colonial Bank of Alabama, 551 So.2d at 395 (citing Lynn StricklandSales Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142
(Ala. 1987)), the trial court correctly granted Pugh's motion for summary judgment. Therefore, we need not address the question whether the appraisal contained a misrepresentation or, if it did, whether Fisher relied on it. The summary judgment is affirmed as to the claims against Pugh.
 III. Fisher's Fraudulent Misrepresentation Claims Against Speaks, Locators, and the Owners
Fisher seeks damages from Speaks, alleging that Speaks, on behalf of, and as an agent for, Locators and the owners of Comer Plantation, fraudulently misrepresented the value of the property and the accuracy of Pugh's appraisal. He also seeks to recover damages against Locators, as Speaks's employer, and against the owners of Comer Plantation, based on a theory of derivative liability. Fisher argues that the trial court incorrectly entered the summary judgment on his claims against each of these defendants. To recover on a claim of fraudulent misrepresentation,see § 6-5-101, Ala. Code 1975, Fisher must establish four elements: "(1) a false representation (2) concerning a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result."Baker v. Bennett, 603 So.2d 928, 935 (Ala. 1992). The gravamen of Fisher's fraud claim is that Speaks willfully, recklessly, or mistakenly misrepresented the value of Comer Plantation. However, Speaks was a conduit who relayed information compiled and reported by the appraiser. Therefore, we must first examine whether relayed information that is incorrect constitutes a misrepresentation.
According to Speigner v. Howard, 502 So.2d 367 (Ala. 1987), those who are only conduits through which faulty information is supplied by one person to a third person cannot be held liable for fraud unless they acted in bad faith. Speigner, 502 So.2d at 371; see also Miller v. Sexton,549 So.2d 10, 12 (Ala. 1989). In Speigner, this Court addressed the question whether one who relays information, unaware of its falsity, can be held liable for fraud. 502 So.2d at 370-71. In that case, the plaintiffs asserted that their real-estate agents had informed them that the roof of a house they were considering buying was in good condition and had no defects. The agents, *Page 464 
however, had no personal knowledge regarding the condition of the roof and merely relied on representations made to them by the seller that the roof was in good condition. When the plaintiffs bought the house, they experienced massive leaks in the roof over one particular room. We held that the defendants were not liable for fraud "for merely conveying the statements of [the seller] to the agent of the [plaintiffs]" without evidence of bad faith. Id. at 371 (emphasis omitted).
In the present case, the faulty information was supplied by Pugh, who prepared the appraisal report that contained the alleged misrepresentations. No evidence in the record suggests that Thomas or Locators retained the right to direct the manner in which Pugh prepared the appraisal; thus, in making it, Pugh was acting as an independent contractor. See generally Fuller v. Tractor Equip. Co., 545 So.2d 757,758-59 (Ala. 1989) (discussing what makes one an independent contractor). The report was received from Pugh by Thomas, who was acting in an arm's-length relationship with Pugh. Thomas was a part-owner of Comer Plantation; he passed the report on to Locators, a real-estate agency he owned. Speaks, as an employee of Locators, ultimately received the report and relayed its contents on to Fisher; its contents included an attestation of accuracy. We can find no evidence in the record indicating that Speaks, Locators, or Thomas acted in bad faith. Therefore, under the authority of Speigner, we conclude that the trial court correctly entered the summary judgment as to Fisher's claims against Speaks and Thomas, because they were conduits passing information supplied by Pugh. Because the liability of Locators and the owners is premised on the liability of Speaks, an agent of Locators, we likewise conclude that the summary judgment was proper as to the claims against them. As to the fraudulent-misrepresentation claims against Speaks, Locators, and the owners, the summary judgment is affirmed.
 IV. Fisher's Breach-of-Duty Claims Against Speaks, Locators, and Thomas
Fisher claims that Speaks, Locators, and Thomas owed him a fiduciary duty to fully inform him (1) that the appraisal presented to Fisher contained a $100,000 mistake and (2) that Thomas was both an owner of Comer Plantation and the owner of the real-estate firm charged with selling the property.[3] These allegations also form the basis for Fisher's claim regarding fraudulent suppression.[4]
We first consider whether Speaks had a duty to disclose the appraisal mistake or to disclose Thomas's relationship with Locators, Speaks's employer. In deciding this question, we are bound by the common law as it existed before the enactment of the Real Estate Consumer's Agency and Disclosure Act ("the Act") — codified at §§ 34-27-80 through -88, Ala. Code 1975 — which became effective after the transactions that resulted in this lawsuit had occurred.[5] According to §6-5-102, Ala. Code 1975, a duty to communicate, or disclose, can arise from (1) "confidential relations of the parties" and (2) "the particular circumstances of the case." We conclude that, under Alabama's common law, an affirmative *Page 465 
duty arose on the part of Speaks to disclose the nature of Thomas's interests as they related to Speaks.
Before the Act was adopted, the well-established rule under Alabama common law was that a real-estate broker could not serve as the agent of a buyer and also of the seller unless both parties, with full knowledge, consented to the broker's dual representation. See Davis v. Brown,513 So.2d 1001, 1001-03 (Ala. 1987); Cashion v. Ahmadi, 345 So.2d 268,271 (Ala. 1977); First S. Fed. Sav. Loan Ass'n v. Nicrosi, 333 So.2d 780,784-85 (Ala. 1976) (Jones, J., dissenting); and Finney v. Long,216 Ala. 628, 631, 114 So. 200, 203 (1927); see also J. Clark Pendergrass, The Real Estate Consumer's Agency and Disclosure Act: TheCase Against Dual Agency, 48 Ala. L. Rev. 277, 287-90 (1996) (discussing dual agency under Alabama common law). In the present case, Speaks's duty of disclosure depends on whether he was a dual agent. Cf. Cashion, 345 So.2d at 270-71 (where this Court refused to adopt the California case of Lingsch v. Savage, 213 Cal.App.2d 729, 29 Cal.Rptr. 201 (1963), which held that if a broker, even if he is an agent of the seller, has knowledge of defects not known to or readily ascertainable by the buyers, the broker is under a duty to disclose those defects, and the failure to do so results in liability to the buyer). Therefore, we are confronted with the precise question whether there was a genuine issue of material fact as to whether Thomas, who was obviously an agent for the sellers, was also an agent for Fisher.
The question of agency in this case depends on whether a jury could have inferred that Fisher and Speaks consented to an agency relationship. See Harold Gill Reuschlein William A. Gregory, The Lawof Agency and Partnership, § 12 (2d ed. 1990) ("Agency is a consensual relationship."). An agency relationship can arise in different ways:
 "While the creation of an agency relationship, so far as the principal and agent are concerned, arises from their consent and usually as the result of a contract, it is not essential that any actual contract exist or that compensation be expected by the agent or agreed to by the parties. While the relationship, in its full sense, arises out of a contractual or gratuitous agreement between the parties, . . . the agency and the assent of the parties thereto may be either express or implied. . . .
 "An express agency is an actual agency created as a result of the oral or written agreement of the parties, and an implied agency is also an actual agency, the existence of which as a fact is proved by deductions or inferences from the other facts and circumstances of the particular case, including the words and conduct of the parties."
3 Am. Jur. 2d Agency § 18 (1986). Fisher argues that Speaks's agency was implied from an amalgam of circumstances and conduct surrounding the negotiation of the purchase of Comer Plantation.
During the negotiations, Speaks conducted himself as if he represented Fisher. He advised Fisher regarding what amount should be offered for the land and also negotiated on Fisher's behalf for the owners to provide culvert pipes to repair damaged roads on the property. The record suggests that Speaks thrust himself into the heart of the transaction on Fisher's behalf; therefore, we conclude that Fisher presented sufficient evidence for the question of Speaks's agency to be submitted to a jury.See Cashion, 345 So.2d at 271 (stating that the question whether a real-estate agent represents a buyer and a seller in the same transaction in a fiduciary capacity is a jury question).
If a jury finds Speaks was Fisher's agent by an implied agency, then it also could infer that Speaks breached his fiduciary duty as Fisher's implied agent — it could infer this from the evidence in the record suggesting that Speaks failed to disclose that his employer, Thomas, was *Page 466 
also one of the owners of Comer Plantation, which was the subject of the agency relationship. Speaks's representation of a group of individuals that included Thomas naturally involved a personal interest in terms of an employee-employer relationship, which was contrary to his fiduciary duty to Fisher unless Fisher consented to the conflict of interest after full disclosure. A jury can reasonably conclude that Speaks's failure to disclose this conflict constituted a breach of his fiduciary duty owed to Fisher.
Whether Speaks and the other defendants had a duty to disclose the error in the appraisal is potentially more complex than the question just answered, but we need not address this issue. Rather, we focus on the nature of the suppression that Fisher alleges. Specifically, he argues that Speaks should have disclosed that the report contained a mathematical error. In Cornelius v. Austin, 542 So.2d 1220, 1222 (Ala. 1989), we stated:
 "We carefully scrutinize the plaintiff's case in a fraud action because `it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests.' Torres v. State Farm Fire Casualty Co., 438 So.2d 757, 758-59 (Ala. 1983). In Torres, we held that `[i]f the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "volunti non fit injuria.'" 438 So.2d at 759 (quoting Monroe v. Pritchett, 16 Ala. 785, 789
(1849))."
Considering the nature of the error in the appraisal report, we conclude that these principles apply here.
The error in the appraisal report appears on the final page of the report. On that page, the appraiser added 10 figures, 1 from each category he had valued. These categories included the values of particular structures, such as the plantation house, as well as the values of specific uses, such as harvesting timber. These 10 figures were presented in a single column and were totaled at the end. Simple arithmetic performed in a moment's time would have revealed the error. The record indicates that parties who typically rely on appraisals, such as banks, always check the figures for mathematical accuracy to guard against the problem experienced by Fisher. Fisher, who is a lawyer with a degree of real-estate experience, surely knew that his reliance on the appraisal would complicate negotiations if there was a mathematical error in its total. Even if a jury found a fiduciary relationship between Speaks and Fisher, the jury could not find that Speaks violated his duty simply by failing to direct Fisher's attention to what Fisher admitted was an "obvious error." We conclude that Fisher's inattention to his own interest precludes him from recovering on his claim alleging suppression of the mathematical error.
We are therefore left with the claim regarding Speaks's failure to disclose Thomas's dual status as an owner of Comer Plantation and the employer of Speaks. We must now decide whether this failure gives Fisher an actionable claim, after considering whether he suffered a loss, and, if so, whether the alleged suppression proximately caused it.
The primary loss Fisher claims is the $50,000 earnest money he forfeited by repudiating his contract to purchase Comer Plantation. He also claims, however, that he lost the benefit of an advantageous bargain he says he would have obtained by purchasing the property and using it for various purposes.
In fraudulent-suppression cases, causation is often discussed in terms of reliance. When deciding whether the plaintiff relied on a misrepresentation, the fact-finder must consider whether the plaintiff would have chosen a different course but for the suppression of a material fact. Shades Ridge Holding Co. v. Cobbs, Allen Hall Mortg.Co., 390 So.2d 601, 611 (Ala. 1980). *Page 467 
The contract for the sale of Comer Plantation included a liquidated-damages clause, which provided:
 "Should the buyer fail to consummate the purchase of the property on or before the Closing Date, the conditions to Buyer's Obligations set forth in this Contract having been satisfied, and Seller not being in default hereunder, Seller may:
 "(1) Retain the earnest money, and cancel this Contract with each party being relieved of any further obligation to the other hereunder . . . ."
After Fisher signed this contract, he sent Locators a check for $50,000 as earnest money. Once he discovered the error in the appraisal report, he repudiated the contract and demanded the return of his payment. The contract, however, unequivocally gave the sellers the right to keep the $50,000 as liquidated damages.[6] Therefore, his repudiation caused him to forfeit his earnest money.
During the negotiations, Fisher was in constant contact with Speaks. Speaks advised him on offering prices, answered questions, and even negotiated a small part of the contract on Fisher's behalf. While Fisher was aware of Speaks's duties to the sellers as a group, he was unaware of Speaks's personal stake in the success of the transaction.
In his deposition, Fisher stated that had he known that Thomas was an owner of Locators as well as a minority owner of Comer Plantation, he would have hired an independent person — someone other than Speaks — to advise him. Presumably, he might have hired a lawyer from the Barbour County area to represent him during the negotiations. Such a lawyer, with an independent perspective of the proposed contract, might have advised Fisher not to agree to purchase Comer Plantation, either under the terms of the contract or under any terms at all, and, in such a case, Fisher would not have been in a position to forfeit his $50,000 earnest money. Under the facts of this case, reasonable persons could conclude that Fisher was induced to enter the contract based on his ignorance of Speaks's personal interest in the consummation of the sale, and they could conclude that, but for this inducement, Fisher would not have suffered a loss. Consequently, we conclude that the summary judgment was improperly entered as to Fisher's claims against Speaks, Thomas, and Locators alleging suppression and breach of fiduciary duty (as those claims related to the failure to disclose the relationship between Thomas and Locators). As to those claims, the summary judgment is reversed.
 V. Fisher's Claim Against Locators as an Escrow Agent
The final issue raised by Fisher is whether Locators breached its duty as an escrow agent.[7] Fisher specifically alleges that a breach occurred (1) when Locators failed to advise him that Comer Plantation, Inc., had filed a declaratory-judgment action seeking to have the earnest money disbursed to it and (2) when, in that declaratory action, Locators did not disclose to the Jefferson Circuit Court that there was a dispute concerning the earnest money.
We addressed the duties of an escrow agent in Gurley v. Bank ofHuntsville, 349 So.2d 43 (Ala. 1977). There, we explained: *Page 468 
 "An escrow agent is generally considered to be the agent of both parties to an escrow agreement. Such an agent is akin to a special agent and is limited in its liability to the proper performance of those duties and obligations specifically delineated in the escrow agreement for the achievement of a specific goal. The escrow instructions constitute the full measure of the agent's obligations and any other matters which arise in the transaction are collateral to the specific objectives of the escrow agreement."
349 So.2d at 45 (citations omitted). In that case, the escrow agent, which was a bank, held earnest money deposited in conjunction with a sale of stock. The purchaser gave the seller a promissory note in exchange for the stock. The seller and the purchaser, however, did not create a security interest in the stock. During the period in which the bank was acting as an escrow agent, it lent money to the prospective purchaser and secured the loan by taking a security interest in the stock. When the purchaser became delinquent on its loan to the bank, the bank foreclosed on the stock. The seller sued the bank, alleging breach of a fiduciary duty to disclose its arrangement with the purchaser. We held that the bank's duties as an escrow agent were limited to the transaction that was the subject of that relationship. Id. at 46. In Gurley, the transaction between the seller and the purchaser and the transaction between the purchaser and the bank were found to have been entirely separate and distinct; therefore, because the alleged breach was collateral to the escrow agreement, the bank did not violate its limited duty to the seller. Id. at 45.
In the present case, however, the failure of Locators to notify Fisher of the pending declaratory-judgment action went to the essence of the escrow agreement. The purpose of the declaratory-judgment action was to determine the proper recipient of the earnest money held in escrow. Indeed, disbursement of this money to the proper party was the sole duty undertaken by Locators. The failure of Locators to notify Fisher, who had an interest directly opposite that of Comer Plantation, Inc., violated this duty by depriving Fisher of the opportunity to oppose the complaint of Comer Plantation, Inc., for a declaratory judgment. Had Fisher known of the declaratory action, he could have exercised his right to intervene. Locators' breach of its duty as an escrow agent, however, prevented Fisher from exercising this right. The summary judgment was improper as to Fisher's claim against Locators alleging breach of its escrow duty. As to that claim, the judgment is reversed.
OPINION OF JANUARY 21, 2000, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; APPLICATIONS FOR REHEARING OVERRULED.
Houston, Cook, Lyons, Johnstone, and England, JJ., concur.
Hooper, C.J., concurs in part and dissents in part.
See, J., concurs in part; concurs in the result in part; and dissents in part.
[1] Fisher's complaint does not allege that Pugh made any intentional misrepresentations; consequently, we need not consider any arguments relating to that theory of recovery. The claim of suppression is likewise not before us because Fisher has failed to present us with a single discernible argument as to why the summary judgment was improper as to that claim. Fisher makes no argument regarding his claim of suppression; consequently, we cannot consider that claim. Bettis v.Thornton, 662 So.2d 256, 267 (Ala. 1995). The sole issue before us regarding Pugh, therefore, is the propriety of the summary judgment against Fisher's claim alleging negligent or wanton misrepresentation.
[2] Several cases decided by courts in other states have applied to appraisers an analysis involving negligent misrepresentation. Some of these cases are Tackling v. Shinerman, 42 Conn. Sup. 517, 630 A.2d 1381
(1993); Larsen v. United Fed. Sav. Loan Ass'n of Des Moines,300 N.W.2d 281 (Iowa 1981); Mattingly v. First Bank of Lincoln,285 Mont. 209, 947 P.2d 66 (1997); Ballance v. Rinehart, 105 N.C. App. 203,412 S.E.2d 106 (1992); First Fed. Sav. Bank v. Knauss, 296 S.C. 136,370 S.E.2d 906 (Ct.App. 1988); Behn v. Northeast Appraisal Co.,145 Vt. 101, 483 A.2d 604 (1984); and Schaaf v. Highfield, 127 Wn.2d 17,896 P.2d 665 (1995).
[3] Fisher also claims that these defendants breached a fiduciary duty by misrepresenting the true value of the property. Because we have already decided the fraudulent-misrepresentation claim adversely to Fisher in Part III, we will not discuss that claim again here.
[4] Fisher's claims regarding breach of fiduciary duty and fraudulent suppression entail an identical analysis; therefore, we address them together.
[5] The real-estate transaction that is the subject of this lawsuit was negotiated in the spring of 1995. Fisher and the owners signed the sales contract for Comer Plantation on March 31, 1995. The Act did not become effective until October 1, 1996, and, consequently, does not apply to this case; we find nothing to indicate the Legislature intended the Act to have a retroactive application.
[6] Fisher does not dispute the validity, or the enforceability, of the liquidated-damages clause.
[7] Fisher makes this claim — the breach of an escrow agent's duty — against those affiliated with Locators as well, including Thomas and Speaks. The summary judgment was clearly proper against this claim as it related to these individuals, because the sales contract specifically designated Locators as the only true holder of the earnest money; therefore, Locators was the sole party assuming the duty of an escrow agent.