{¶ 37} Allowing real-estate appraisers to use the lack of contractual privity to third parties — who have detrimentally relied on an appraiser's material misrepresentations — is archaic and shortsighted. Allowing appraisers to escape liability for inflated appraisals by a shield of privity is to raise form over substance and pettifoggery over justice.
 {¶ 38} This is particularly so in view of the likelihood of collusion among industry professionals and the quagmire of complexities involved in most mortgage fraud schemes. Appraisals are the linchpin of mortgage fraud — and the banks that fund the loans are often not in technical privity with the appraisers, though they must of necessity rely on their reports.
 {¶ 39} I would adopt the Restatement 2d of Torts, Section 552 (" § 552"), and hold real-estate appraisers liable for negligently misrepresenting material information that is detrimentally relied on by foreseeable third parties. Extending § 552 to appraisers is justifiable because (1) mortgage fraud is a rampant pandemic with destructive effects; (2) faulty appraisals comprise the illusory cornerstones on which most mortgage-fraud schemes depend; (3) licensed real-estate appraisers are engaged in a profession and should be held to professional standards; and (4) mortgage fraud usually involves collusion among multiple parties — including appraisers. Under these circumstances, allowing appraisers to circumvent liability based on a lack of privity is wrong. And this conclusion is buttressed where, as here, there has been an adjudicated instance of mortgage fraud.
 I. What's the Big Flippin' Deal? {¶ 40} Property flipping and mortgage fraud are a big deal. The U.S. Department of Housing and Urban Development ("HUD") defines property flipping as a practice where property is bought, falsely appraised at a higher value, and then quickly sold — often aided by a lender's collusion with the appraiser.[31] The fraudulent appraisal is what makes property flipping illegal.
 {¶ 41} Property flipping is a type of mortgage fraud. Mortgage fraud is a material misstatement, misrepresentation, or omission relied on by an underwriter or lender to fund, purchase, or insure a loan; and it is one of the fastest growing white-collar crimes in the United States.[32] These schemes usually involve fraudulent appraisals, doctored loan documents, and inflation of the buyer's income.[33] Last year, federally regulated institutions reported mortgage-fraud losses over one billion dollars.[34]
 {¶ 42} Real-estate appraisers are paid to give a professional opinion (the appraisal) on how much a home is worth on the market. Lenders need appraisals to ensure that, if they must foreclose on the property, it will sell for at least what they are lending.[35] Inflated real-estate appraisals are necessary to almost any mortgage fraud scheme. A faulty appraisal increases the sales value and induces lenders to issue loans that far exceed the property's true market value. The result is a home that costs more than it is worth — negative equity. In a classic property-flip, the property flipper buys property for $100,000, has the property fraudulently appraised for $300,000, and sells the property for $300,000 (a $200,000 profit). Usually the home later undergoes foreclosure, leaving the bank with a $300,000 mortgage on a $100,000 home, for a loss of $200,000.
 {¶ 43} These scams adversely affect homeowners, lending institutions, real-estate professionals, and eventually the health of the U.S. economy. In 2005, Ohio had the nation's highest foreclosure rate.[36]
 {¶ 44} In an attempt to abate the quick buy-sell facets of property flipping, HUD has limited financing through Federal Housing Administration ("FHA") insured mortgages. FHA-insured mortgage eligibility now requires that (1) only owners of record can sell properties that will be financed using FHA-insured mortgages; (2) the property may not be resold within 90 days from the last sale to be eligible for FHA financing; and (3) for resales that occur within 91 and 180 days where the new sales price exceeds the previous sales price by 100 percent or more, additional documentation must be provided to confirm the property's value. Also, the new rules provide flexibility for FHA to examine and require additional evidence of appraised value when properties are resold within 12 months. Clearly property flipping is a national epidemic.
 {¶ 45} Further, in an attempt to quell the effects of external pressure on appraisers, the Ohio General Assembly has passed S.B. No. 185, effective January 1, 2007. The bill seeks to dampen the influence of lenders and mortgage brokers on real-estate appraisers by outlawing coercion and bribery.[37] Offenders are guilty of a fifth-degree felony.[38] S.B. No. 185 also places restrictions on who may issue an appraisal. As of January 1, 2007, only licensed or certified appraisers may perform a real-estate appraisal for a mortgage loan.[39] All certified or licensed appraisers must comply with the Uniform Standards of Appraisal Practices.[40]
 II. Privity: a Reprieve from Negligence? {¶ 46} Patrick and Zajac furnished professional real-estate appraisals to mortgage brokers Premiere Service Mortgage, T.R. Funding, and Charter First Banc. The loans were then sold to Midas (now bankrupt), and then to Trustcorp. In fact, Trustcorp's money funded the loans — everyoneelse was just a conduit. Trustcorp alleged that it justifiably relied on the appraisals that were furnished by Patrick and Zajac, and ordered by mortgage brokers Premiere Service Mortgage, T.R. Funding, and Charter First Banc.
 {¶ 47} Trustcorp alleged that (1) Patrick and Zajac appraised property on which Trustcorp issued mortgage loans; (2) before funding the loans, it relied on the appraised value provided by Patrick and Zajac to justify the loans; (3) the appraisals were inflated and unreasonable; (4) the value of the properties was substantially less than the value represented by Patrick and Zajac; (5) when the loans were foreclosed on, the properties were under collateralized, resulting in a substantial economic loss to Trustcorp (allegations of a typical property-flipping scheme); and (6) had the appraisals been accurate, Trustcorp would not have funded the loans.
 {¶ 48} Patrick and Zajac respond that, even if all the alleged facts were true, there were still no material issues of fact because they were not in contractual privity with Trustcorp. That is, the appraisals were ordered by another party (mortgage brokers Premiere Service Mortgage, T.R. Funding, and Charter First Banc), and lack of privity provided a reprieve against a negligence claim based solely on economic loss. That is a pure legal fiction, because Trustcorp's money really funded the loans.
 {¶ 49} Trustcorp argues that it is industry practice for a buyer of a mortgage loan from a mortgage broker or lender to obtain and rely on an appraisal performed for the originating mortgage broker or previous lender; and that § 552 should be applicable to provide a limited exception to the lack-of-privity bar. Of course they are correct.
 {¶ 50} Generally, absent contractual privity between two disputing parties, "there is no * * * duty to exercise reasonable care to avoid intangible economic loss or losses to others that do not arise from tangible physical harm to persons and tangible things."[41] In an action based on negligence, the economic-loss rule holds that "a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable."[42] One exception to the economic-loss rule is set forth in § 552, which has been adopted by the Ohio Supreme Court in limited circumstances.[43] But the Ohio Supreme Court has not said whether those limited circumstances apply to a downstream lender who relies on a real-estate appraisal provided for an intermediate mortgage broker.
 {¶ 51} So the issue is whether we should hold professional appraisers liable to a third party for alleged negligent misrepresentation where the third party detrimentally relies upon the professional appraiser's materially inaccurate and negligent appraisal of a parcel of real property. I say yes. And so does the great weight of authority.
 III. Extending § 552 to Real-Estate Appraisers {¶ 52} Subsection (1) of § 552 states, "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." Subsection (2) further explains that "the liability stated in Subsection (1) is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance on it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction." The Restatement fits this case perfectly.
 {¶ 53} The Ohio Supreme Court in Haddon View Investment Co. v. Coopers Lybrand has adopted and applied § 552 in holding an accountant liable to a party other than an immediate client for negligent misrepresentation in the course of the accountant's professional services.[44]
 {¶ 54} I would apply the Ohio Supreme Court's holding in HaddonView by analogy to the facts of this case. In a similar case from South Carolina, an appellate court adopted the § 552 approach for determining the scope of an accountant's duty to third parties who use and rely on the accountant's work.[45] Like the Ohio Supreme Court in HaddonView, the South Carolina appellate court in ML-Lee Acquisition Fund
determined that accountants can be liable to a party other than an immediate client for negligent misrepresentation in their professional services. Relying on that case, a federal appellate court sitting in diversity and interpreting South Carolina law predicted that the South Carolina Supreme Court would hold a professional appraiser liable to a third party for negligent misrepresentation if the third party detrimentally relied on the professional appraiser's materially inaccurate and negligent appraisal of the market value of a parcel of property.[46] I would follow the Hadden View § 552 approach by analogy and hold real-estate appraisers liable to a downstream lending institution, as did the court in Private Mortgage InvestmentServices.
 {¶ 55} Ohio appellate courts have applied § 552 to purchasers relying on appraisals that were generated for the lender[47] and to buyers for attorneys' negligent misrepresentations in real-estate contracts.[48]
 {¶ 56} In Perpetual Federal Savings and Loan Assn. v. Porter PeckInc., an Ohio appellate court considered the liability of an appraiser who had sold an appraisal to a mortgage broker.[49] The lender loaned money in reliance on the appraisal. The property was later found to be in violation of a zoning code. The lender then sued the appraiser, though the lender was not the immediate client of the appraiser. The court held that § 552 was applicable to the appraiser and the lender even if they were not in contractual privity. The evidence inPerpetual Federal Savings showed that (1) appraisers establish values for properties; (2) lending institutions rely on the appraisals; (3) appraisals are vital to lending institutions; (4) if appraisals are wrong and lending institutions rely on them, the institutions are at risk of losing money; and (5) appraisers know that people rely on their work and expect an appraisal to be correct.[50]
 {¶ 57} Thus § 552 has already been applied to appraisers not in privity by the only court in Ohio that has considered this issue. Yet the majority blithely states that the parties are more "attenuated" because there might be one more intermediary party — ignoring that (1) if Trustcorp justifiably relied on the appraisal, it doesn't matter under Restatement § 552 how many parties there are — it is a question of fact; and (2) Trustcorp actually funded the loans. DistinguishingPerpetual is sophistry — the majority just declines to follow it.
 IV. The Bank is the Victim {¶ 58} Trustcorp was duped by a property-flipping scheme. An inflated appraisal is instrumental in these schemes, and I have no problem holding a professional appraiser civilly liable for economic losses incurring because a third party justifiably relied on the appraiser's materially inaccurate and negligent appraisal. Professional appraisers should know that their appraisals will be relied on by a lending institution[51] — even if the appraisers do not know the specific lender.[52]
 {¶ 59} Moreover, applying § 552 to appraisers is a workable formula and accords with decisions from other state courts — including Utah, Alabama, California, Connecticut, Wisconsin, Iowa, North Carolina, New York, New Mexico, and another court in Ohio.[53]
 {¶ 60} An appraisal is not a formality in the process; it is a professionally prepared report and opinion that is relied on by lenders, mortgage brokers, and buyers in the ordinary course of business. Those who are injured by inflated appraisals are not always the ones directly involved with the appraiser. I would reverse and remand to allow Trustcorp the opportunity to prove its negligent misrepresentation case under § 552.
[31] See http://www.fbi.gov/page2/dec05/operationquickflip121405.htm.
[32] See id.
[33] http://www.fbi.gov/page2/dec05/operationquickflip121405.htm.
[34] See id.; see, also, Mortgage Asset Research Institute's Mortgage Fraud Case Report to MortgageBanker's Association (April 2006), http://www.mari-inc.com/pdfs/mba/MBA8thCaseRpt.pdf.
[35] http://www.realestatejournal.com/buysell/mortgages/ 20050527-simon.html.
[36] Policy Matters Ohio: Foreclosure Growth in Ohio 2006, at www.policymattersohio.org.
[37] R.C. 4763.12(E).
[38] R.C. 4763.99(B).
[39] See R.C. 4763.19(A).
[40] R.C. 4763.13(A).
[41] Floor Craft Floor Covering, Inc. v. Parma Community General Hosp.Assn. (1990), 54 Ohio St.3d 1, 3, 560 N.E.2d 206, citing Prosser 
Keeton, Law of Torts (5 Ed.1984) 657, Section 92.
[42] See id. (internal citations omitted).
[43] See Haddon View Investment Co. v. Coopers Lybrand (1982),70 Ohio St.2d 154, 436 N.E.2d 212.
[44] (1982), 70 Ohio St.2d 154, 436 N.E.2d 212.
[45] See ML-Lee Acquisition Fund v. Deloitte Touche (1995),320 S.C. 143, 463 S.E.2d, 618, affirmed in part and reversed on other grounds (1997), 327 S.C. 238, 489 S.E.2d 470.
[46] See Private Mortgage Investment Services, Inc. v. Hotel and ClubAssn. Inc. (C.A.5 2002), 296 F.3d 308.
[47] See Washington Mut. Bank v. Smith, 11th Dist. No. 2001-L-238,2003-Ohio-6910.
[48] See Orshoski v. Krieger (2001), 6th Dist. No. OT-01-009, appeal denied (2002), 94 Ohio St.3d 1488, 763 N.E.2d 1185.
[49] (1992), 80 Ohio App.3d 569, 609 N.E.2d 1324.
[50] See id. at 1326.
[51] See Perpetual Federal Savings and Loan Assn. v. Porter PeckInc., supra.
[52] See Rest.2d Torts, Section 552, Comment h, illustrations 6, 7. See, also, Bily v. Arthur Young Co. (1992), 11 Cal.2d 51, 64,834 P.2d 745.
[53] See West v. Inter-Financial Inc. (2006), 553 Utah Adv.Rep. 8, 139 P.3d 1059; Fisher v. ComerPlantation, Inc. (Ala. 2000), 772 So.2d 455;Soderberg v. McKinney (1996), 44 Cal.App.4th 1760; Tackling v.Shinerman (1993); 42 Conn.Supp 517, 630 A.2d 1381; Costa v. Neimon
(1985), 123 Wis.2d 410, 366 N.W.2d 410; Larsen v. United Federal Saving Loan Assn. (Iowa 1981), 300 N.W.2d 281; Alva v. Cloninger (1981), 51 N.C.App. 602, 277 S.E.2d 535; Chemical Bank v.National Union FireIns. (1980), 425 N.Y.S.2d 818, 74 A.D.2d 786; Stotlar v. Hester (1978),92 N.M. 26, 582 P.2d 403; Private Mortgage Investment Services, Inc. v.Hotel and Club Assn. Inc., supra; but, see, Huntington Mortg. Co. v.Mortgage Power Fin. Servs. (D. Md. 2000), 90 F.Supp.2d 670.