**Wayne LARSEN and Sharon Larsen, Appellees,**

v.

**UNITED FEDERAL SAVINGS AND LOAN ASSOCIATION OF DES MOINES, Appellant.**

**No. 64765.**

Supreme Court of Iowa.

Jan. 14, 1981.

"appraisal fee" at $75. The loan officer told Mrs. Larsen UFS would make the appraisal but if they were "jammed up" someone else would do it.

November 14, 1977, the house was appraised by Allen Hutchison, a salaried UFS employee with about two years of appraising experience. UFS retained the $75 appraisal fee paid by Larsens. The first line of the printed appraisal report used by Hutchison designated Wayne Larsen as the "Borrower/Client." It disclosed the $45,000 sale price and the loan amount of $29,000. Nothing was written in the space provided for "COMMENTS (including functional or physical inadequacies, repairs needed, modernization, etc.)." Various features of the house were noted, together with a description of three "comparable sales." Hutchison placed $45,000 on the "indicated value by market data approach" line, a "dash" on the "indicated value by income approach" line, and added the comment, "Both approaches indicate a reasonable sale." The "Certification and Statement of Limiting Conditions" attached to the appraisal included the following provision:

8. Neither all, nor any part of the content of the report, or copy thereof [including conclusions as to the property value . . .] shall be used for any purposes by anyone *but the client specified in the report*, the mortgagee or its successors and assigns . . . without the written consent and approval of the Appraiser.

(Emphasis supplied.)

Hutchison testified it was the custom in the community for the borrower or his sales representative to be advised of the fact the appraisal was made, and of the results. He admitted that on deposition he had identified Wayne Larsen as the borrower and client, and had then stated he had done the appraisal for them. He also admitted UFS was in a "peak demand" period in November 1977 and that in those circumstances he would sometimes "hurry through an appraisal." He was told by his supervisors to be "more careful."

Ben Sapp, UFS vice-president, and senior appraiser and supervisor of residential appraisers, admitted that when deposed he identified Wayne Larsen as "the borrower and the client." He acknowledged the certification form presently used by UFS specifically listed as one who could utilize the report "the borrower if he pays the appraisal fee," and that there had been no change in that policy since October of 1977.

Larsens awaited the appraisal "to find out whether the house was worth the money." UFS notified Larsens through their realtor that the appraisal "was okay and there was nothing wrong." They did not receive the written appraisal until they called for it several days after the loan was obtained and the sale consummated on December 29, 1977. Nonetheless, there was substantial evidence that they knew the significance of the appraisal, and that their purchase of the home depended on the $29,-000 loan which in turn depended on the appraisal. They relied on the results of the appraisal in purchasing the property.

When Larsens moved into the house they began to notice major structural defects for the first time. These defects were initially observed because the furniture would not set straight and the pictures hung crooked. The floors were very uneven and there was a six-inch drop in the floor from the back to the front of the house. The doors would fall shut or open, depending on location, and had been sawed off as much as two inches to clear the floor when they were opened. Liquids spilled on the table would roll right off. The beds had to be shimmed up at one end. The children called the house "The Wonder Spot," after a "tipsy house" in a Wisconsin amusement park. A structural engineer UFS later sent out testified there was a "differential settlement within the foundation," and as a result,

[t]he floors were uneven, the walls were out of plumb, the basement wall in the garage area was failing, this sort of thing. It was also obvious to me that most of the house with the exception of the kitchen had a very uneven floor.

After three persons in the construction business examined the house, Wayne Larsen called UFS about March 1, 1978. This

resulted in a meeting at the association's office between the Larsens, Ben Sapp (UFS vice-president) and senior vice-president Donald Payne. Wayne Larsen detailed the problems with the house and related estimates of repair costs from the persons who had inspected it. Sapp agreed to inspect the house, and he arrived the next day. Mrs. Larsen testified Sapp remarked about the uneven floors, and pointed out the bulging wall in the basement garage stating, "he couldn't understand why the appraiser didn't see that." Sapp looked at the doors that had been sawed off. He said "it shouldn't have been appraised at what it was appraised at. It shouldn't have been appraised at $45,000." Mrs. Larsen further testified Sapp said he knew United Federal was an understanding bank and that they "would take care of it." He stated, "Don't worry about it, they will help you out and it [will] be to your satisfaction."

When Wayne Larsen telephoned Sapp later, he told Larsen he was going to come back out but not to worry about it, stating, "we'll do something, we'll take care of it or something." Sapp returned again with Hutchison and an unidentified woman. UFS then sent the structural engineer, Gordon Burns, whose trial testimony has been partially set out above, to inspect the home. It was his opinion "a normal person walking through the house [would] notice these problems." He estimated the necessary repair costs to correct the structural defects could run as high as $19,000.

After the engineer's inspection Larsens were called back to UFS. They were told by Payne that "they [UFS] didn't feel any responsibility toward the problem to the house." Payne admitted that in this exchange Mrs. Larsen charged that Sapp had indicated the property "was not near worth $45,000," and that neither he nor Sapp denied the statement had been made. Payne said UFS would not have made the loan if the problems with the house had been known.

Other evidence will be referred to in discussing the issues addressed in the following divisions.

I. *Did UFS owe a duty to Larsens that could give rise to damages for negligence in performing the appraisal?*

Larsens' claim against UFS is grounded on a theory of negligence: that UFS negligently supplied misinformation to them concerning the results of the appraisal, which induced them to complete the purchase of the property. UFS asserted it owed no duty to Larsens with respect to the appraisal.

■ Of course the existence of a duty is a prerequisite to establishing a claim of negligence. *See Wilson v. Nepstad,* 282 N.W.2d 664, 667 (Iowa 1979); *Lewis v. State,* 256 N.W.2d 181, 188 (Iowa 1977); W. Prosser, *Handbook of the Law of Torts* § 30, at 143 (4th ed. 1971). But "[i]n absence of a statutory obligation, to state there is or is not a duty is merely to state a result, a conclusion that plaintiff's interests are or are not entitled to legal protection against defendant's action or lack thereof." *Wittrup v. Chicago & Northwestern Railway,* 226 N.W.2d 822, 823 (Iowa 1975).

> [I]n negligence cases the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk.
>
> .     .     .     .     .
>
> ... [I]t should be recognized that "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.

Prosser, *supra,* § 53 at 324–26.

Narrowing the focus, we must determine whether UFS, acting through its employee assigned to appraise Larsens' home, owed these borrowers a duty of care which, if breached, gave rise to a negligence action.

In support of their claim that a legal duty was owed them by UFS, Larsens rely on *Ryan v. Kanne,* 170 N.W.2d 395 (Iowa 1969). There, certified public accountants were employed to prepare a financial statement and to determine the accounts payable of a lumber business. They were informed the owner was trying to refinance

and it was possible a corporation would be formed to take over the business. The accountants were negligent and underrepresented the accounts payable. The financial statement was used and relied upon by the acquiring corporation to solicit stock subscriptions. The issue presented was whether the corporation could recover from the accountants for damages resulting from the negligently prepared audit. The latter argued they were not liable because there was no privity: they had been hired by the former owner of the company, not by the acquiring corporation that relied on the financial statement. *Id.* at 397–401.

■ In *Ryan*, 170 N.W.2d at 401, this court expressly departed from the "strict rule" of the lead case, *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931),[1] which held accountants had no duty of care to reasonably foreseeable reliant parties. The *Ryan* court held that because "the risk reasonably to be perceived defines the duty to be obeyed," 170 N.W.2d at 401,

> [w]hen the accountant is aware that the balance sheet to be prepared is to be used by a certain party or parties who will rely thereon in extending credit or in assuming liability ..., the lack of privity should be no valid defense to a claim for damages due to the accountant's negligence. We know of no good reason why accountants should not accept the legal responsibility to known third parties who reasonably rely upon financial statements prepared and submitted by them.

*Id.* We limited the *Ryan* rule to situations in which the party seeking recovery is "actually foreseen and a member of a limited class of persons contemplated," *id.* at 402, and one "for whose benefit and guidance the accountant *knows* the information is intended," *id.* at 403. Thus in determining whether a duty exists in this case, the key inquiry is whether UFS knew or should have foreseen that Larsens would rely on its appraisal.

Although in this case there is conflicting testimony as to whether the "client" for whom the appraisal was prepared was UFS or Larsens, we hold a jury question was generated. Wayne Larsen was designated "Borrower/Client" on the appraisal itself. UFS was the *employer* of Hutchison, the appraiser, and it would seem anomalous for one's employer to be considered one's "client." The evidence established it was the custom with UFS, and in the lending community, to provide the appraisal results upon the borrower's request. We hold UFS is charged with the knowledge that Larsens might rely on the appraisal results in completing their home purchase.

UFS argues a lending institution appraises for its own purpose and protection, "solely to justify its investment in the subject property." It relies on *United States v. Neustadt*, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961). There an FHA appraiser, at the request of the *seller*, inspected a house to determine its eligibility for FHA mortgage insurance. The ultimate buyers were informed of the FHA appraised value and, after buying the home, found a structural problem. They sued the government under the Federal Tort Claims Act. *Id.* at 698–700, 81 S.Ct. at 1296–97, 6 L.Ed.2d at 617–18. The Supreme Court reversed a judgment for the buyers, holding 28 U.S.C. § 2680(h) precluded recovery under the Tort Claims Act upon "[a]ny claim arising out of ... misrepresentation." *Id.* at 711, 81 S.Ct. at 1302–03, 6 L.Ed.2d at 624. Although there is language in *Neustadt* suggesting the Court also concluded no duty was owed by the government to make an accurate appraisal for the purchasers' benefit, *see id.* at 708–09, 81 S.Ct. at 1301–02, 6 L.Ed.2d at 622–23, it is clear the Court's rationale was based on the "misrepresentation" exception to the Tort Claims Act. Further, the appraisal was performed for the sellers, be-

---

1. The *Ultramares* rationale also has been rejected by several modern courts and commentators. *See, e. g., Rhode Island Hospital Trust National Bank v. Swartz, Bresenoff, Yavner & Jacobs*, 455 F.2d 847, 851 & n.2 (4th Cir. 1972); *Rusch Factors, Inc. v. Levin*, 284 F.Supp. 85, 90–92 (D.R.I.1968); Mess, *Accountants and the Common Law: Liability to Third Parties*, 52 Notre Dame Law, 838, 850-57 (1977); Besser, *Privity?—An Obsolete Approach to the Liability of Accountants to Third Parties*, 7 Seton Hall L.Rev. 507, 541–42 (1976).

fore the buyers even came into the picture. *Neustadt* is not necessarily inconsistent with the *Ryan* requirement that the alleged negligent party know that some ascertained person may rely on the data he or she supplies.

■ Nor is it necessary, under the *Ryan* analysis, that the party suing for negligence be the only party for whom the information was provided. It is enough that he or she be a third party whom the negligent provider of the information knew would utilize it. Even though the appraisal might be made primarily for the benefit of the lending institution, the appraiser should also reasonably expect the home purchaser, who pays for the appraisal and to whom the results are reported (and who has access to the written report on request), will rely on the appraisal to reaffirm his or her belief the home is worth the price he or she offered for it. The purchaser of the home should be among those entitled to rely on the accuracy of the report and therefore should be entitled to sue for damages resulting from a negligent appraisal.

This is especially true when we "take into consideration the end and aim of the transaction," *Ryan*, 170 N.W.2d at 403, which in this case is a loan transaction that will enable the Larsens to purchase a home. If the home had been found to be worth less than the $45,000 offer, we can safely assume the association would not have accepted the mortgage, nor would the Larsens have wished to pay that amount for the home. It is undisputed that had the appraisal reflected the real market value of the home the loan would have been refused and Larsens could have canceled or renegotiated their contract. Thus, taking the "aim" of the transaction into account, *both* the lending institution and the buyers should be foreseen as users of the appraisal report as an important factor in their respective decisions to lend money and to borrow money to purchase the home.

The *Restatement (Second) of Torts* § 552 (1977), suggests guidelines for defining those persons who may recover against one who negligently supplies information for the guidance of others. This section states in relevant part:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable *reliance upon the information*, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) . . . [T]he liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

■ It is plain from this language that liability may extend to losses sustained by more than one person, as long as the supplier of the information (1) intended to supply the information to that person (similar to the knowledge required by *Ryan*), or (2) knew the *recipient* intended to supply it.

■ Liability is even more fully exposed if, as logic demands, we refuse to follow the lead of UFS in bifurcating the roles of UFS and its own employee-appraiser. There is no good reason not to recognize UFS itself as the paid supplier of the information, making the appraisal through its own employee and then furnishing the results to the Larsens for their guidance in the real estate loan-purchase transactions. UFS had every reason to know its appraisal would influence this home purchase transaction, which encompassed the loan transaction. It is not unreasonable to hold UFS to a duty of care to the Larsens, an obvious party to that transaction. We believe this analysis sufficiently narrows the scope of liability to meet the requirements of *Ryan* and section

552 of the Restatement. We hold UFS had a duty to the Larsens with respect to the appraisal.

II. *Was there sufficient evidence to support a jury finding that the appraisal was performed negligently?*

■ We believe the evidence already set out generated a jury issue on Hutchison's negligence in making the appraisal. Mrs. Larsen's testimony concerning the remarks made by Sapp, an officer and supervising appraiser for UFS, when he inspected the house is supported by the notations he made on the appraisal form in March 1978:

Exterior Brick—shows checking problems FLOORS UNEVEN—TERRIBLE CONDITION Home East & West settling
. . . .

Hutchison testified he noticed the uneven floors on his second visit to the home and that if he had observed them on the first visit he would have noted it in his appraisal. We have already referred to his admission he was hurried on his first inspection. The engineer's testimony, set out in division I, suggests defects that a jury might find a competent appraiser should have noticed.

We note parenthetically that at the conclusion of all the evidence UFS withdrew its affirmative defense of contributory negligence.

We hold there was sufficient evidence to carry the issue of the negligence of UFS to the jury.

III. *Was there sufficient evidence of repair cost to carry the damage issue to the jury?*

UFS argues there was no substantial evidence of damages to permit any award and, alternatively, that the judgment was excessive and not supported by substantial evidence.

Burns, the structural engineer who examined the home for UFS, testified the cost of repairing the house would run between $15,000 and $19,000. In granting a new trial in absence of a remittitur, trial court found it had misinterpreted Burns' testimony when it submitted a jury instruction

that permitted a recovery up to $28,000. This was, in fact, the amount of the verdict.

■ Because UFS has appealed in this new trial-remittitur situation, the original judgment is reinstated. *See* Iowa R.Civ.P. 250; *Ackerman v. Lauver*, 242 N.W.2d 342, 347 (Iowa 1976). Thus we review the sufficiency of evidence to support the original verdict of $28,000.

■ We have recognized a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages. If it is speculative and uncertain whether damages have been sustained, recovery is denied. *Patterson v. Patterson*, 189 N.W.2d 601, 605 (Iowa 1971). If uncertainty lies only in the amount of damages, recovery may be had if there is a reasonable basis in the evidence from which the amount can be inferred or approximated. *Pringle Tax Service, Inc. v. Knoblauch*, 282 N.W.2d 151, 153 (Iowa 1979). It seems clear there was more than adequate evidence in this case to support a finding that damages were sustained. We hold that while there is uncertainty as to the amount of damages, there was sufficient evidence to support a jury verdict of $20,000.

Larsens' expert witness Rexroth, a real estate appraiser, placed a $45,000 fair market value on the property on October 27, 1977, disregarding the structural defects. Taking the structural defects into consideration as of the same date, he placed the fair market value at $25,000, a difference of $20,000. In arriving at the "as is" value, Rexroth took into consideration comparable sales, Burns' estimated cost of repairs, and an element Rexroth characterized as "entrepreneurship"—"the incentive for an individual buying the property . . . to go through the problems of hiring a contractor and getting the work completed."

Although UFS rejects the "entrepreneurship" concept, we think under our above rule it may be interpreted merely to mean that a buyer would discount the property by more than estimated repair cost because of the uncertainty and trouble inherent in major structural repairs to a home.

We agree with trial court and with UFS that there is insufficient evidence to justify a verdict in excess of $20,000. Accordingly, we exercise our inherent right to order a remittitur. *See Miller v. Young*, 168 N.W.2d 45, 53 (Iowa 1969). If Larsens shall file in this proceeding in district court a consent to remit all of the verdict in excess of $20,000 within 30 days from the filing of this opinion, the district court judgment appealed from shall stand and shall draw interest at the statutory rates from date of entry. If the consent to remit is not so filed, a new trial is hereby ordered. Costs are taxed to UFS.

This case is therefore

MODIFIED AND AFFIRMED ON CONDITION, AND REMANDED.