# IN THE SUPREME COURT OF IOWA

No. 11–1484

Filed November 16, 2012

**HENRY A. BAGELMANN, JR.** and
**MARY JO BAGELMANN,**

    Appellants,

vs.

**FIRST NATIONAL BANK** and
**IOWA BANKERS MORTGAGE CORPORATION,**

    Appellees.

---

Appeal from the Iowa District Court for Bremer County, Bryan H. McKinley, Judge.

Borrowers appeal summary judgment denying their tort and contract claims arising out of alleged violations of the National Flood Insurance Act by their lender and loan servicer. **JUDGMENT OF THE DISTRICT COURT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS.**

Bruce J. Toenjes of Nelson & Toenjes, Shell Rock, for appellants.

William D. Werger of Leslie, Collins, Gritters & Werger, PLLC, Waverly, for appellee First National Bank.

Deborah M. Tharnish and Sarah K. Franklin of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellee Iowa Bankers Mortgage Corporation.

**MANSFIELD, Justice**.

This case is part of the fallout from the June 2008 flooding that caused so much destruction in our state. In 2001, the Bagelmanns purchased a home in Waverly along the Cedar River. At the time, they were told, incorrectly, that the property was not in a special flood hazard area and that flood insurance would not be required as a condition of their loan. The Bagelmanns received the same erroneous information again in 2003 when they refinanced their loan to pay for remodeling. In the spring of 2008, their loan servicer was advised that the property actually was in a special flood hazard area. However, this information was not passed along to the Bagelmanns until *after* their home had flooded on June 10, 2008, and it was too late to buy flood insurance. Although the Bagelmanns ultimately received a FEMA buyout equal to the preflood appraised value of their home, they contend they suffered substantial monetary damages. They have brought suit against the 2001/2003 lender as well as the 2008 loan servicer.

The district court granted summary judgment to the defendants, and the plaintiffs have appealed. We agree with much of the district court's analysis and uphold its conclusions that: (1) the Bagelmanns cannot use the requirements of the National Flood Insurance Act (NFIA) as a basis for a state-law claim; (2) the defendants did not breach a contract with the Bagelmanns (including the covenant of good faith and fair dealing); and (3) the Bagelmanns do not have a viable negligent misrepresentation claim. However, we find a claim could potentially exist based on Restatement (Second) of Torts section 551(2) and reverse and remand for further proceedings thereon.

### I. Facts and Procedural Background.

This is an appeal from a grant of summary judgment, so we "(1) view the facts in the light most favorable to the nonmoving party, and (2) consider on behalf of the nonmoving party every legitimate inference reasonably deduced from the record." *Van Fossen v. MidAmerican Energy Co.*, 777 N.W.2d 689, 692–93 (Iowa 2009).

Henry and Mary Jo Bagelmann decided in August 2001 to move to Waverly, Iowa. They came across a property for sale—1501 Horton Road, adjacent to the Cedar River—and began the process of securing potential financing. On or before August 8, 2001, the Bagelmanns met with Beverly Leisinger, a mortgage loan officer at First National Bank of Waverly (FNB). The Bagelmanns signed a loan application at that time. Leisinger also informed the Bagelmanns that FNB would have to secure a flood determination for the bank's compliance with federal law requirements.[1] Leisinger told the Bagelmanns that FNB used a specific firm on a regular basis and told them the price. She said that she could order the determination right away and share that information with them.

FNB arranged for CBE-CIGNA Flood Services, a predecessor of LandAmerica One Stop, Inc., to provide a flood zone determination.[2] After examining Federal Emergency Management Agency (FEMA) flood maps created in 1990, LandAmerica concluded, erroneously, that 1501 Horton Road was in "Flood Zone X" and did not require flood insurance. Unfortunately, the property was actually in "Flood Zone AE," an area

---

[1]Namely, the National Flood Insurance Act, 42 U.S.C. §§ 4001–4129 (2006).

[2]We will refer to LandAmerica and its predecessors collectively as "LandAmerica."

subject to the insurance requirement, not "Flood Zone X." Unbeknownst at the time, LandAmerica had looked at the wrong map—one that did not include 1501 Horton Road at all.

On or about August 14, 2001, Leisinger received the written "Standard Flood Hazard Determination" from LandAmerica stating that flood insurance was not required. She shared this information with the Bagelmanns. She told the Bagelmanns, "[W]e got the flood determination report and you do not need flood insurance." The Bagelmanns contend they would not have moved forward with the transaction if they had known 1501 Horton Road was in a special flood hazard area.

On or about August 16, 2001, the Bagelmanns made an offer to purchase the property, and on August 17, the Bagelmanns executed a purchase agreement with the seller for $238,500. The seller's disclosure statement noted that some water had seeped up into the crawlspace in the 1999 flood. The disclosure statement also stated that the property was *not* located in a flood plain.

Before closing, the Bagelmanns took several steps to investigate the property themselves. Henry Bagelmann personally inspected the crawlspace and reviewed photographs from 1999 to confirm the accuracy of the seller's disclosure about previous flooding. In addition, the Bagelmanns consulted with their insurance agent, who reiterated (based on the erroneous flood hazard determination) that they did not need to obtain flood insurance. Finally, the Bagelmanns arranged for someone to survey 1501 Horton Road to determine its elevation relative to a nearby bridge. The house was higher than the bridge and therefore, the Bagelmanns concluded, would be safe from floods because the state would not likely build a bridge at a flood-prone elevation.

At closing, the Bagelmanns received a copy of LandAmerica's flood insurance determination. They also received and signed a notice provided by FNB stating that the property was not in a special flood hazard area and that flood insurance was not required, but cautioning that the home may be "near a [special flood hazard area]" and that "you, or your lender, may want to consider the advisability of obtaining flood insurance at reduced rates." The Bagelmanns were told to "make your own determination as to whether you desire any such coverage." The Bagelmanns also paid FNB a $22 fee at closing for LandAmerica's flood hazard determination. This was listed on the settlement statement as "FLOOD MONITORING TO THE CBE GROUP, INC."

Two years later, in 2003, after having performed extensive remodeling on their home, the Bagelmanns sought to refinance their mortgage with FNB. Again, FNB hired LandAmerica to make the federally required flood hazard determination, and again LandAmerica erroneously placed 1501 Horton Road outside the special flood hazard area. The Bagelmanns maintain they would not have remodeled their home had they known it was in a flood hazard area. The settlement statement shows the Bagelmanns paid an $18 fee for this flood hazard determination. The fee was described as "FLOOD DETERMINATION TO THE CBE GROUP, INC." At the 2003 closing, the Bagelmanns received a copy of LandAmerica's flood insurance determination and signed another notice advising them to consider purchasing flood insurance anyway, and to make their own determination whether they desired such coverage.[3]

---

[3]The erroneous LandAmerica flood hazard determination that the Bagelmanns received in 2003, unlike the one they had received in 2001, contained the following bold-type disclaimer:

Shortly after closing on the 2003 refinancing, FNB assigned the loan to the Iowa Banker's Mortgage Company (IBMC), which in turn sold the loan to Fannie Mae. IBMC remained the loan servicer. The Bagelmanns knew FNB planned to assign the refinanced loan. After the assignment, the Bagelmanns sent their loan payments to IBMC.

FEMA issued new flood insurance maps on March 4, 2008. After reviewing the maps, on March 28, LandAmerica issued a new flood hazard determination to IBMC, correctly placing 1501 Horton in a special flood hazard area. The property's status on the maps did not change from 1990 to 2008; the only difference was that LandAmerica read the correct map this time. In late May, LandAmerica transmitted lists of properties with "changed" flood hazard determinations (including 1501 Horton Road) to FNB and IBMC. FNB and IBMC concede they knew by then that the Bagelmanns' property was in a special flood hazard area and required flood insurance as a loan condition. IBMC acknowledges it may have known this earlier; it cannot tell when it received the March 28 notice from LandAmerica.

On June 10, 2008, catastrophic flooding of the Cedar River severely damaged the Bagelmanns' home. The flooding also damaged or destroyed some of their personal property. On June 12, IBMC mailed the Bagelmanns a letter dated June 9 that said, "We have been informed that your property has been reviewed and is now considered to be in a flood zone." The letter said, "Please contact your insurance agent immediately and obtain the insurance. The insurance must cover your loan balance

_____
This flood determination is provided solely for the use and benefit of the entity named in Section 1, Box 1 [i.e., FNB] in order to comply with the 1994 Reform Act and may not be used for or relied upon by any other entity or individual for any purpose, including but not limited to deciding whether to purchase a property or determining the value of a property.

of $221,035.49." The Bagelmanns received this letter on June 14. For its part, FNB never sent the Bagelmanns a notice concerning the revised flood hazard determination. Had the Bagelmanns been notified earlier than June 14 that they were in a special flood hazard area, they contend they would have purchased flood insurance (which could have been bound immediately) and would have avoided a substantial loss on the property.

Despite the fact that the property lacked flood insurance, FEMA paid the Bagelmanns the preflood appraised value of $415,000 for their property plus a $10,850 moving/relocation allowance. After netting the mortgage payoff to Fannie Mae, the Bagelmanns received $190,647.33 for their home. However, even with the buyout, the Bagelmanns maintain they suffered $418,872.98 in monetary damages that could have been avoided.

LandAmerica is now in bankruptcy.[4] On September 29, 2010, the Bagelmanns brought an action in the Bremer County District Court asserting the following claims against FNB and IBMC: (1) breach of contract against FNB for the initial incorrect flood hazard determinations in 2001 and 2003; (2) breach of contract against both FNB and IBMC for failing to make subsequent determinations and for failing to notify them of the correct March 2008 determination *before* June 10, 2008; (3) breach of contract against FNB and IBMC based on the theory that the Bagelmanns were third-party beneficiaries of the loan assignment agreement between FNB and IBMC; (4) negligence against FNB and IBMC for the erroneous initial determinations, failing to make subsequent correct determinations, and failing to timely notify them of the March

---

[4]The Bagelmanns filed a claim in the bankruptcy.

2008 determination; (5) negligent misrepresentation against FNB for the erroneous flood hazard determinations in 2001 and 2003; (6) breach of the covenant of good faith and fair dealing against IBMC; and (7) punitive damages against IBMC.

Subsequently, both FNB and IBMC moved for summary judgment. Both defendants disputed that they had ever contracted with the Bagelmanns to provide them with accurate flood hazard determinations or that the assignment of the mortgage from FNB to IBMC covered this subject. Both disputed that they had any legal duty to provide accurate flood hazard determinations. FNB also argued that its employees were not negligent and any negligence was that of LandAmerica. Additionally, citing numerous out-of-state authorities, IBMC argued that recognizing a negligence cause of action against it would be inconsistent with principles of federalism given the absence of a *federal* cause of action under the NFIA for erroneous flood hazard determinations. Lastly, IBMC argued that it could not be sued for breaching a covenant of good faith and fair dealing unless there was an underlying contract on the subject.

The district court granted summary judgment to both defendants. It first noted that there was no private right of action available under the NFIA. Then, it observed that most states considering the matter have rejected state common law claims by borrowers against lenders for erroneous flood hazard determinations. It found that there was no contract between the parties concerning flood hazard determinations. Additionally, it found that plaintiffs' good faith and fair dealing claim could not succeed outside the context of a contract, and that plaintiff's claim for punitive damages failed because it was based entirely on the good faith and fair dealing claim. Lastly, relying on the structure and purpose of the NFIA, the absence of a private right of action under that

statute, and principles of federalism, it rejected plaintiffs' negligence claims. This appeal followed.

## II. Standard of Review.

We review a district court's grant of summary judgment for correction of errors at law. *Van Fossen*, 777 N.W.2d at 692–93. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3).

## III. Legal Analysis.

**A. The National Flood Insurance Act.** The National Flood Insurance Act was originally enacted in 1968 with the goals of providing affordable flood insurance to home owners living in high-risk areas and easing the burden that flood disasters place on the federal treasury. 42 U.S.C. § 4002 (2006). The NFIA basically put the federal government in the flood insurance business.

In 1973, the NFIA was amended to prohibit federally regulated lending institutions from making any real estate loans in a special flood hazard area unless the property was covered by flood insurance. *Id.* § 4012a(b).[5] Lenders were authorized to charge borrowers a "reasonable

---

[5]That provision states:

Each Federal entity for lending regulation . . . shall by regulation direct regulated lending institutions not to make, increase, extend, or renew any loan secured by improved real estate . . . located or to be located in an area that has been identified by the Director as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, unless the building or mobile home and any personal property securing such loan is covered for the term of the loan by flood insurance in an amount at least equal to the outstanding principal balance of the loan . . . .

fee" to cover the initial determination whether a home is in a special flood hazard area, and subsequent "life-of-loan monitoring." 12 C.F.R. § 339.8(a) (2010). When property is in such an area, the lender must notify the borrower of the requirement to have flood insurance. 42 U.S.C. § 4012a(e)(1).[6] If the borrower fails to buy such insurance within forty-five days of being notified, the lender is required to buy it for the borrower and charge the costs back to the borrower. *Id.* § 4012a(e)(2). Also, a lender that has a "pattern or practice" of violating the requirements of this section shall be assessed civil penalties "by the appropriate Federal entity." *Id.* § 4012a(f)(1)–(2); *see also id.* § 4104a(1) (providing that "[e]ach Federal entity for lending regulation . . . shall by regulation require regulated lending institutions" to give advance notice of the flood insurance requirement before closing on the loan); 12 C.F.R. § 339.3 (prohibiting federally insured state banks from making loans in special flood hazard areas unless the property is covered by flood insurance).

---

42 U.S.C. § 4012a(b).

[6]That provision states:

> If, at the time of origination or at any time during the term of a loan secured by improved real estate . . . located in an area that has been identified by the Director (at the time of the origination of the loan or at any time during the term of the loan) as an area having special flood hazards and in which flood insurance is available under the National Flood Insurance Act of 1968, the lender or servicer for the loan determines that the building . . . securing the loan is not covered by flood insurance or is covered by such insurance in an amount less than the amount required for the property pursuant to paragraph (1), (2), or (3) of subsection (b) of this section, the lender or servicer shall notify the borrower under the loan that the borrower should obtain, at the borrower's expense, an amount of flood insurance for the building . . . that is not less than the amount under subsection (b)(1) of this section, for the term of the loan.

*Id.* § 4012a(e)(1).

Federal courts, including the Eighth Circuit, have uniformly found that no express or implied federal private cause of action exists under these provisions of the NFIA. In *Hofbauer v. Northwestern National Bank of Rochester*, 700 F.2d 1197 (8th Cir. 1983), the court considered a fact scenario somewhat similar to the present one. The Hofbauers had purchased a home in Rochester, Minnesota, financed by Northwestern National Bank. The bank failed to tell them the home was in a special flood hazard area, the Hofbauers did not purchase flood insurance, and later they suffered losses when their home flooded. The Hofbauers sued the bank for violating the NFIA. *Hofbauer*, 700 F.2d at 1198–99.

The Eighth Circuit noted that no express right of action exists under the statute. *Id.* at 1199. It added that other courts had previously rejected an implied private right of action. *Id.* at 1200 (citing *Arvai v. First Fed. Sav. & Loan Ass'n*, 698 F.2d 683 (4th Cir. 1983); *Till v. Unifirst Fed. Sav. & Loan Ass'n*, 653 F.2d 152 (5th Cir. 1981); *R.B.J. Apartments, Inc. v. Gate City Sav. & Loan Ass'n*, 315 N.W.2d 284 (N.D. 1982)). Turning to its own analysis, the Eighth Circuit then pointed out that the provisions in question "seem[] primarily concerned with protecting lenders, not borrowers"; that they "do not directly require lenders to do anything" and are "directed instead to those federal agencies that supervise lenders"; that they contain "an administrative enforcement mechanism"; and that other flood-insurance laws have an express private right of action, showing that when Congress wanted to provide a private remedy, it knew how to do so. *Id.* at 1200–01. For these reasons the court found that no implied private right of action existed. *Id.*

Other decisions since *Hofbauer* have reinforced this conclusion. *See Paul v. Landsafe Flood Determination, Inc.*, 550 F.3d 511, 513 (5th Cir. 2008) (stating that "the Act does not create an implied private right

of action for borrowers when a determination is erroneously made that property is outside a flood zone"); *Mid-America Nat'l Bank of Chi. v. First Sav. & Loan Ass'n of S. Holland*, 737 F.2d 638, 643 (7th Cir. 1984) ("Absent any indication that Congress intended a federal cause of action in favor of borrowers against lenders under Sections 4012a(b) and 4104a, this Court is not in a position to create such a cause of action.").

But it should be noted that the Eighth Circuit did not terminate the litigation in *Hofbauer*. Instead it granted the Hofbauers' request to remand the case back to state court, explaining,

> [e]ven though the Hofbauers cannot assert a private cause of action arising under federal law, the federal statutes may create a standard of conduct which, if broken, would give rise to an action for common-law negligence. That is a question of Minnesota law best left to the courts of that State.

700 F.2d at 1201.

We are confronted here with the question that the Eighth Circuit left open in *Hofbauer*: Can a borrower sue a lender under state law in negligence for failing to discharge a duty created by the NFIA? For the reasons that follow, we believe the answer to this question is no.

**B. State Law Negligence Duties Arising out of Failure to Comply with the National Flood Insurance Act.** The Bagelmanns allege that FNB was negligent in its issuance of the flood hazard determinations in 2001 and 2003, and that both FNB and IBMC were negligent in failing to timely notify them of the March 2008 redetermination. A number of state courts, citing principles of federalism, have barred state negligence claims based upon alleged violations of the NFIA. In *Highmark Federal Credit Union v. Hunter*, a homeowner whose house had flooded sued the lender for negligently failing to warn her to purchase flood insurance. 814 N.W.2d 413, 414

(S.D. 2012). After recognizing that *Hofbauer* left this issue unresolved, the court considered whether the homeowner could proceed under South Dakota law. *Id.* at 416. The court noted that while the action was for negligence, the underlying *duty* still arose from the NFIA. *Id.* The court then concluded, "If the NFIA does not create a private right of action, then it follows that an individual cannot use the NFIA to establish a duty in an individual civil claim." *Id.* at 418.

Other courts have reached the same result. *See Wentwood Woodside I, LP v. GMAC Commercial Mortg. Corp.*, 419 F.3d 310, 323 (5th Cir. 2005) (holding that "section 4012a does not give rise to a private right of action under Texas law for negligence *per se*"); *Lukosus v. First Tenn. Bank Nat'l Ass'n*, 89 F. App'x 412, 412 (4th Cir. 2004) (rejecting claims charging banks "with various common law offenses based on their failure to provide proper flood certification"); *Ellis v. Countrywide Home Loans, Inc.*, 541 F. Supp. 2d 833, 838 (S.D. Miss. 2008) (making an *Erie* guess that the Mississippi Supreme Court would decline to recognize state common law claims against lenders for allegedly erroneous flood hazard determinations); *Duong v. Allstate Ins. Co.*, 499 F. Supp. 2d 700, 703–04 (E.D. La. 2007) (rejecting a claim under Louisiana law for failure to make a correct flood hazard determination); *Dollar v. NationsBank of Ga., N.A.*, 534 S.E.2d 851, 853 (Ga. Ct. App. 2000) (holding that a bank "had no duty to [its customer] to accurately make" a flood hazard determination); *Mid-America Nat'l Bank of Chi. v. First Sav. & Loan Ass'n of S. Holland*, 515 N.E.2d 176, 180 (Ill. App. Ct. 1987) (declining to adopt the NFIA as the standard of care in a state negligent misrepresentation action against lenders in light of "the separation of powers doctrine and the principles of federalism which militated against Federal courts formulating a private cause of action"); *Jack v. City of Wichita*, 933 P.2d

787, 793 (Kan. Ct. App. 1997) (rejecting a borrower's negligence claim against a lender as without merit because "the [NFIA] do[es] not create a duty which would support a claim for negligence" and because the borrower–lender relationship "is not the sort of 'special relationship' which justifies imposing a duty"); *Guyton v. FM Lending Servs., Inc.*, 681 S.E.2d 465, 473–75 (N.C. Ct. App. 2009) (declining to recognize a North Carolina common law duty arising from the NFIA, but recognizing one under that state's Mortgage Lending Act); *R.B.J. Apartments*, 315 N.W.2d at 289–90 (declining to allow a negligence cause of action based on violation of the NFIA); *Pippin v. Burkhalter*, 279 S.E.2d 603, 604 (S.C. 1981) ("It is clear that the provisions are intended to protect a class of loans supervised, approved, regulated or insured by the federal government and all those associated with such loans. There can be no implied cause of action in the purchaser.").

The Bagelmanns cite no reported case that has recognized a state law negligence claim by a borrower against a lender relating to an erroneous flood hazard determination. *Cf. Klecan v. Countrywide Home Loans, Inc.*, 951 N.E.2d 1212, 1215–17 (Ill. App. Ct. 2011) (allowing state law negligence action to go forward against a lender's subsidiary that performed the determination); *Paul*, 550 F.3d at 515–19 (allowing a state law negligence action to proceed against the company that actually made the flood hazard determination).[7]

---

[7]In *Small v. South Norwalk Savings Bank*, which neither party referred to in their briefing, the Connecticut Supreme Court upheld a negligence verdict in favor of a homeowner against a lender for failing to disclose the property she had purchased was located within a flood zone. 535 A.2d 1292, 1296–97 (Conn. 1988). However, as the South Dakota Supreme Court noted in *Highmark*, the defendant in *Small* failed to file a timely motion to set aside the verdict and thus the Connecticut Supreme Court's review was limited to plain error. *See Highmark*, 814 N.W.2d at 418; *Small*, 535 A.2d at 1295–97.

Although "federalism" may not be the best label to apply, we agree with the reasoning in the foregoing cases.[8] The circumstance they present is not one where a legal duty (e.g., to manufacture a safe product) would otherwise exist under state law, and where federal law is only being invoked as a standard of conduct. *Cf. Hofbauer*, 700 F.2d at 1201 (allowing for the possibility that "the federal statutes may create a standard of conduct which, if broken, would give rise to an action for common-law negligence"). Rather, the alleged duty to advise customers about flood insurance in these cases arose only because of federal law.

In the absence of a statute, banks normally would not have an underlying obligation to tell customers whether they need flood insurance or not. *See Engstrand v. W. Des Moines State Bank*, 516 N.W.2d 797, 799 (Iowa 1994) ("The banking-customer relationship does not automatically create a fiduciary duty."); *Fed. Land Bank of Omaha v. Woods*, 480 N.W.2d 61, 67 (Iowa 1992) (holding that a bank did not have a duty to learn of or disclose defects in title); *see also Dollar*, 534 S.E.2d at 853 (noting that the lender and the borrower "were involved in an arm's length mortgage transaction" rather than a "confidential relationship" regarding the need for flood insurance); *Jack*, 933 P.2d at 793 (observing that the borrower–lender relationship does not justify imposing a duty to advise the borrower that insurance would be needed).[9] We therefore agree it would be inconsistent with the lack of a

---

[8]"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, ___ U.S. ___, ___, 132 S. Ct. 2492, 2500, 183 L. Ed. 2d 351, 368 (2012). Yet normally we think of preemption, in its various forms, as the means by which national sovereignty is protected. *Id.* at ___, 132 S. Ct. at 2500–01, 183 L. Ed. 2d at 368–69.

[9]As a general matter, Iowa has adopted the following rule governing a mortgage lender's duty of care to a borrower:

private right of action *under* the NFIA to authorize a negligence action based upon a duty that exists only *because of* the NFIA. As the North Carolina Court of Appeals has said:

> [T]reating 42 U.S.C. § 4104a(a)(1) as creating an independent state law duty would have the practical effect of recognizing an implied private right of action under that statute in all but name. Like other courts that have considered this approach, we believe that it would inappropriately circumvent the widely-accepted understanding that Congress did not intend to create a federal private right of action under 42 U.S.C. § 4104a(a)(1) to directly utilize that statutory provision as the basis for a state law claim. As a result, we believe that a state law claim of the type that Plaintiffs have sought to assert against Defendant, if any, must rest on a legal duty arising under one or more provisions of state law totally independent of 42 U.S.C. § 4104a(a)(1).

*Guyton*, 681 S.E.2d at 474–75 (footnote omitted).

The NFIA protects borrowers to a certain degree, but its main focus is on protecting regulated lenders and the federal government. This is evident in the actual requirements the Act imposes. The insurance only needs to be sufficient to cover the outstanding principal balance of the loan. 42 U.S.C. § 4012a(b)(1). "If Congress had passed the statute primarily for the benefit of borrowers, it would have required that they insure their equity in the home." *Hofbauer*, 700 F.2d at 1200. Moreover, if the law were designed to offer broad protection to homeowners in flood zones, it would not have limited the insurance requirement only to those

---

"Ordinarily, there is no duty on the part of a lender to inspect the mortgaged property to determine that the borrower is obtaining that which he may have been promised by the vendor or that which he believes he is obtaining. Unless some further obligation is assumed, the lender's inspection of the premises to be mortgaged is made only to ascertain whether the property has sufficient value to secure the loan and is made by the lender for its benefit only."

*Fed. Land Bank of Omaha*, 480 N.W.2d at 67 (quoting *Fed. Land Bank of Baltimore v. Fetner*, 410 A.2d 344, 348 (Pa. 1979)).

homes financed by federally regulated lenders. 42 U.S.C. § 4012a(b)(1). More specifically, the Act's scope suggests that disclosure to borrowers was not a principal goal. There is no requirement that lenders provide any detail regarding flood risks, beyond a notification that a property is in a flood zone and requires insurance. *See id.* §§ 4012a(e)(1), 4104a(a)(1).

If the lenders that the NFIA seeks to shield from financial harm were subjected to common law liability derived from the Act, this could be seen as undermining the purposes of the Act. Other state courts share this concern:

> The policy of protecting the Federal treasury would not be furthered by holding federally insured lenders liable under the Act. The statutes themselves do not directly confer any benefit on borrowers, nor do they directly impose any burden on lenders. The statutes, along with the regulation, are part of a comprehensive administrative scheme. The proper Federal agency has authority to issue cease and desist orders against bank officials, terminate unsound practices, impose administrative remedies including penalties, and require affirmative action to prevent or correct violations. The existence of such supervisory and enforcement authority at the administrative level strongly suggests no broad private remedies were intended. Furthermore, Congress expressly provided for private rights of action under other provisions of the Act. Congress balanced the competing interests of borrowers, lenders, and the government through the use of an administrative agency. Recognizing either a contract or negligence action under the Act might upset this balance.

*Lehmann v. Arnold*, 484 N.E.2d 473, 481 (Ill. App. Ct. 1985) (citations omitted) (declining to recognize a cause of action under Illinois law against a lender for failing to comply with NFIA requirements).

**C. The Bagelmanns' Negligence Claims.** None of this, however, forecloses the possibility that an *independent* state law duty could exist based upon something other than a violation of the NFIA. *See Guyton*, 681 S.E.2d at 475 (reversing dismissal of borrowers' claims to the extent

they "alleged conduct on the part of Defendant sufficient to establish a violation of a legal duty established under North Carolina state law independent of 42 U.S.C. § 4104a(a)(1)").

The Bagelmanns advance one candidate for such a duty, the "assumed duty" provision of the Second Restatement of Torts. *See* Restatement (Second) of Torts § 323 (1965).[10] The Bagelmanns argue that FNB (at least) undertook to render a service to them when it started to advise them regarding the requirement (or lack of a requirement) for flood insurance. Hence, it was required to perform that service with due care. *See id.*

The problem with this argument is that only when the defendant "intends to render *services to another* that are necessary for *the other's* protection is liability under section 323 even possible." *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 177–78 (Iowa 2002) (holding that statements by tobacco companies that they would report on the results of their research into the health effects of cigarette smoking were not an undertaking within the meaning of section 323). Here FNB, and later IBMC, were not trying to render a service to the Bagelmanns for the Bagelmanns' protection. They were complying with a federal law that required them to determine whether the property was in a special flood

---

[10]This section provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323, at 135 (1965).

zone and, if so, give notice and make certain that the property was covered by flood insurance. *See, e.g., Duong*, 499 F. Supp. 2d at 704 ("Both Louisiana courts and federal courts agree that a flood zone determination is undertaken for the benefit of the lender and not for the benefit of the borrower."); *Dollar*, 534 S.E.2d at 853 (noting that "[the bank's] determination as to whether or not [the borrower's] residence was in a flood hazard zone was made, not for [the borrower's] benefit, but for the purpose of protecting the bank's interest in its collateral").[11]

A lender "undertakes" to notify a borrower regarding the need for flood insurance because federal law *requires* it to do so. Hence, the Bagelmanns' section 323 argument becomes essentially another way to try to convert the statutory requirements of the NFIA into a state common law duty. If section 323 were a sufficient basis for imposing an affirmative duty on lenders to exercise due care to notify borrowers regarding the need for flood insurance, it could have been asserted in any of the foregoing cases that rejected state common law claims. Based on our prior reasoning, we do not believe section 323 constitutes an independent ground for finding a state law duty here.

However, this case presents a wrinkle that did not exist in the other state common law cases we have discussed above. Here the Bagelmanns have provided evidence from which a fact finder could draw an inference that FNB and IBMC *knew* (not merely should have known) by at least late May 2008 that their property was in a flood zone, and that prior representations to the contrary were incorrect. Is this a circumstance that under Iowa law could give rise to a claim, even if the

---

[11]Neither party disputes that FNB's representative told the Bagelmanns in their initial meeting "that the Bank would have to secure a flood determination for the Bank's compliance with . . . federal law requirements."

NFIA did not exist?  Restatement (Second) of Torts section 551(2) provides:

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
> . . . .
>
> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so . . . .

Restatement (Second) of Torts § 551(2), at 119 (1977).

In other words, under the Restatement, there is a duty to exercise reasonable care to disclose information that a party to a not-yet-consummated business transaction knows will make untrue or misleading a previous representation.  This duty, we believe, could not apply to FNB, since in 2008 it no longer had a banking relationship with the Bagelmanns.  *See Dahlgren v. First Nat'l Bank of Holdrege*, 533 F.3d 681, 697 (8th Cir. 2008) (rejecting the application of Restatement section 551 to "a transaction occurring after the bank is no longer financing the customer").  However, in *Wright*, we held a manufacturer of cigarettes could be liable under section 551(2) for failing to disclose to a consumer "subsequently acquired information that would prevent a prior statement from being false or misleading."  652 N.W.2d at 175–76.

In *Guyton*, the court recognized the plaintiffs' theory that the lender "actively and intentionally withheld the information that the property lay in a flood plain . . . in order to induce Plaintiffs to purchase the property" could be an independent state law basis for liability.  681 S.E.2d at 475.  Here, by contrast, the Bagelmanns have not alleged fraudulent conduct, merely negligent conduct.  Yet, in light of the existence of section 551(2), we are not prepared to say at this time that

they have no claim against IBMC over its failure to disclose the new flood hazard determination before June 10, 2008.

We are not deciding that the Bagelmanns actually have a valid § 551(2) claim. Issues that have not been briefed to us need to be addressed, including whether there was a "transaction" that was yet to be "consummated." Other legal or factual defenses may exist as well. It would not be appropriate for us to decide these matters at the present time.

Therefore, on the Bagelmanns' negligence claim, we affirm the grant of summary judgment to FNB, but reverse the grant of summary judgment to IBMC and remand for further proceedings on a potential claim based on Restatement (Second) of Torts section 551(2).

**D. Negligent Misrepresentation.** The Bagelmanns have asserted a negligent misrepresentation claim against FNB only. They allege that the erroneous flood hazard determinations they received from FNB in 2001 and 2003 amounted to negligent misrepresentations. Iowa has adopted the definition of the tort of negligent misrepresentation found in the Restatement (Second) of Torts. *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 111 (Iowa 2012). The elements are as follows:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts § 552, at 126–27 (1977).

FNB points out that some out-of-state decisions have rejected negligent misrepresentation claims filed against lenders over erroneous flood hazard determinations, applying the same rationale that has led to the dismissal of general negligence claims. *See, e.g.*, *Duong*, 499 F. Supp. 2d at 704; *Mid-America Nat'l Bank of Chi.*, 515 N.E.2d at 180. The Bagelmanns note, however, that a North Carolina appellate case appears to recognize negligent misrepresentation as a potentially viable ground for a borrower to recover from a lender based on a mistaken flood hazard determination. *See Guyton*, 681 S.E.2d at 478–79 (ultimately denying the claim because plaintiffs alleged only that defendant "acted intentionally without ever advancing an alternative allegation that Defendant acted unintentionally or negligently").

The Bagelmanns analogize the present case to *Larsen v. United Federal Savings & Loan Ass'n of Des Moines*, 300 N.W.2d 281 (Iowa 1981). *Larsen* was a negligent misrepresentation case where we upheld a jury verdict against a lender whose employee had negligently prepared an inflated appraisal. 300 N.W.2d at 283–85. The borrowers had overpaid for the house in reliance on the appraisal. *Id.* We specifically found the lender owed a duty to the borrower under the circumstances of that case. *Id.* at 285–88. We observed:

Even though the appraisal might be made primarily for the benefit of the lending institution, the appraiser should also reasonably expect the home purchaser, who pays for the

appraisal and to whom the results are reported (and who has access to the written report on request), will rely on the appraisal to reaffirm his or her belief the home is worth the price he or she offered for it. The purchaser of the home should be among those entitled to rely on the accuracy of the report and therefore should be entitled to sue for damages resulting from a negligent appraisal.

*Id.* at 287.

Additionally, plaintiffs draw a parallel between this case and *Garren v. First Realty, Ltd.*, 481 N.W.2d 335 (Iowa 1992). In *Garren,* the plaintiffs were not told the property they were buying was in a fringe flood zone. 481 N.W.2d at 336. The property later was damaged by flooding. *Id.* After settling with the appraiser, the mortgage lender, and the sellers, the plaintiffs sued the real estate broker. *Id.* They obtained a jury verdict, but it was reduced due to the apportionment of fault among the settling parties. *Id.* at 337. The plaintiffs appealed the decision to apportion fault. *Id.*

We held that fault was properly apportioned among those parties. *Id.* at 339–40. The plaintiffs argued they had not relied upon the lender and the appraiser to disclose flood zoning, but we found "it can be properly inferred that plaintiffs relied on the lender and appraiser to accurately appraise the property." *Id.* at 340. As in *Larsen*, the plaintiffs "paid the lender a fee to have the property appraised." *Id.* "The appraiser was required to determine whether the property was in a flood zone." *Id.* The plaintiffs certified in their loan application their awareness of the appraisal amount. *Id.* *Garren* contains no mention of flood insurance; like *Larsen,* it is a case where the theory of lender liability was based on an inaccurate appraisal. *Id.*

The Bagelmanns contend that a flood hazard determination is similar to an appraisal: While the document is prepared principally for the lender, the borrower has to pay for it and should be able to bring a

negligent misrepresentation claim if it is inaccurate due to the fault of the lender.[12]

Yet we need not resolve whether *Larsen* and *Garren* control the duty question here, because the summary judgment record contains no evidence of FNB's *negligence* with respect to the 2001 and 2003 flood hazard determinations. FNB moved for summary judgment below on the alternative ground that it had not been negligent. It maintained that "[n]o FNB employees actually performed either of the flood certifications" and "[n]o FNB employees had any knowledge or could have reasonably known that the flood certifications were not accurate." Before us, it makes the same arguments:

> There is no allegation FNB did not use reasonable care in securing a flood determination from a third party according to the applicable federal law . . . . The provider of an erroneous flood determination may have a duty under Section 552 of the Restatement Second that would allow a negligent misrepresentation claim, but the lender that ordered the determination and does not have reason to know it is inaccurate certainly would not.

*See DeVoss v. State*, 648 N.W.2d 56, 61 (Iowa 2002) ("We have in a number of cases upheld a district court ruling on a ground other than the one upon which the district court relied *provided* the ground was

---

[12]Additionally, in *Sturm v. Peoples Trust & Savings Bank*, despite finding no private right of action under federal law to sustain a borrower's claim against a lender over a loan disclosure, we nonetheless separately considered the borrower's negligent misrepresentation claim. 713 N.W.2d 1, 4–5 (Iowa 2006). There the plaintiffs alleged that the HUD-1's they had signed failed to comply with the applicable federal law, i.e., the Real Estate Settlement Procedures Act (RESPA), *and* amounted to negligent misrepresentations. *Id.* at 2 ("The gist of the Sturms' suit against Peoples is that the loan papers were deficient under federal statutes and common law."). After finding no private right of action under RESPA, we went on to address the plaintiffs' negligent misrepresentation claim, noting the plaintiffs' contention that it "provided a basis for recovery independent of their statutory claim." *Id.* at 4. We ultimately upheld the dismissal of that claim on other grounds. *Id.* at 5. Thus, we did not decide the question whether a negligent misrepresentation claim could proceed if the duty to issue the HUD-1's arose only because of RESPA.

urged in that court."). We therefore may affirm summary judgment on the negligent misrepresentation claim on this alternative ground.

Unlike in *Larsen*, where the bank's own employee performed the appraisal, here FNB hired a third party—LandAmerica—to make the flood hazard determinations.[13] There is no evidence or allegation that FNB acted negligently in retaining this company. Nor is there any indication that FNB should have realized the information in LandAmerica's reports was incorrect. The only negligence alleged by the Bagelmanns with respect to this time period—reading the wrong map and reaching the wrong special flood hazard area conclusion—belongs to another party. Accordingly, the district court properly granted summary judgment to FNB on the Bagelmanns' negligent misrepresentation claim.

**E. Breach of Contract.** We turn now to the Bagelmanns' breach of contract claims. If FNB or IBMC had entered into a contract to provide the Bagelmanns with accurate flood hazard determinations, this could result in the creation of an independent legal duty, notwithstanding the absence of a private right of action under the NFIA.

The Bagelmanns are fairly clear as to what allegedly amounted to *breaches* of contract, namely, the inaccurate 2001 and 2003 flood hazard determinations and the failure to provide a correct determination before June 10, 2008. However, they are less clear as to where *the contracts themselves* can be found.

After reviewing their briefing, we believe the Bagelmanns are potentially relying on the following transactions as relevant contracts: (1) their $22 payment for the 2001 flood hazard determination, (2) their

---

[13]In *Garren* it appears the appraiser was not an employee of the lender. However, the negligence of the lender was not at issue.

$18 payment for the 2003 determination, (3) the mortgages, and (4) the assignment agreement between FNB and IBMC. We will address these in order.

As the Bagelmanns note, in 2001 and 2003 they paid fees at closing for written flood hazard determinations performed by a third party that were later discovered to be incorrect. However, both the 2001 and the 2003 determinations stated that they were prepared by LandAmerica when the Bagelmanns received them. The Bagelmanns had been advised that FNB was ordering these reports from a third party.[14] The settlement statements indicated that the fees for these determinations were being paid to that third party. The Bagelmanns have no evidence that FNB guaranteed or warranted the accuracy of these third-party determinations. *See, e.g.*, *Cardozo v. True*, 342 So. 2d 1053, 1057 (Fla. Dist. Ct. App. 1977) (stating that a bookseller does not impliedly warrant the material communicated by the book's author or publisher). In fact, the 2003 determination said in bold type that the determination was provided solely for the benefit of FNB and "may not be used for or relied upon by any other entity or individual for any purpose, including, but not limited to deciding whether to purchase a property or determining the value of a property."

The 2001 mortgage is not in the record. Regardless, it would have been discharged at the time of the 2003 refinancing. The 2003 mortgage was an integrated contract that authorized the lender to require the borrower to pay for "flood zone determination." However, as noted above, there was no warranty or guaranty of the accuracy of the flood hazard

---

[14]The Bagelmanns claim they were not aware that FNB had failed to make an independent investigation of the flood hazard status. However, they do not cite any communication with FNB as leading them to that conclusion.

determination. In fact, the flood hazard determination said it was "solely for the use and benefit" of FNB and "may not be used for or relied upon by any other entity or individual for any purpose." The mortgage contained no promise to notify the mortgagors of updated flood hazard determinations. *See Lass v. Bank of Am., N.A.*, 695 F.3d 129, 136 (1st Cir. 2012) (indicating that the mortgage and the flood insurance notification provided at closing should be read together as a single contract); *see also Sobi v. First S. Bank, Inc.*, 946 So. 2d 615, 616–617 (Fla. Dist. Ct. App. 2007) (noting that a construction loan agreement gave the bank the right to require flood insurance but did not require it to obtain a flood insurance certificate before funding construction draws). The Bagelmanns have not shown a triable issue of fact as to whether FNB (or IBMC) breached the 2001 or 2003 mortgages.

Finally, we cannot conclude that the Bagelmanns were third-party beneficiaries of the assignment agreement between IBMC and FNB. A third-party beneficiary claim requires that " 'the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.' " *Midwest Dredging Co. v. McAninch Corp.*, 424 N.W.2d 216, 224 (Iowa 1988) (quoting Restatement (Second) of Contracts § 302, at 439–40 (1981)). This one-page document does not include a promise that IBMC would provide flood hazard determinations, let alone indicate that such determinations would be for the benefit of the Bagelmanns. The Bagelmanns argue, "Perhaps the biggest problem with the District Court's conclusion that there was no contract to notify the Bagelmanns of changes in the flood hazard status is that IBMC did in fact notify the Bagelmanns of the change in the flood hazard status in June of 2008." But as we have already discussed, federal law *required* IBMC to do this. 42 U.S.C. § 4012a(e)(1).

We are unaware of any out-of-state case recognizing that a lender had an independent contractual obligation to accurately perform an NFIA-required flood hazard determination.  Instead, a few cases have rejected breach of contract claims, albeit with limited discussion and analysis.  *See Lukosus v. First Tenn. Bank Nat'l Ass'n*, No. 2:02CV00084, 2003 WL 21658263, at \*1–2 & n.3 (W.D. Va. July 9, 2003) (dismissing breach of contract claim), *aff'd* 89 F. App'x 412 (4th Cir. 2004); *Lehmann*, 484 N.E.2d at 481 (upholding dismissal of both negligence and breach of contract claims and stating that "[r]ecognizing either a contract or negligence action under the Act might upset" the balance struck by Congress).

For the foregoing reasons, we affirm the entry of summary judgment on the Bagelmanns' breach of contract claims.

**F. Covenant of Good Faith and Fair Dealing.**  The Bagelmanns also allege that IBMC breached an implied covenant of good faith and fair dealing when it delayed in telling them about the 2008 flood hazard determination.

We agree with the district court that this claim cannot succeed as a matter of law.  An implied duty of good faith and fair dealing is recognized in all contracts.  Restatement (Second) of Contracts § 205, at 99; *Fogel v. Trs. of Iowa Coll.*, 446 N.W.2d 451, 456 (Iowa 1989).  But the covenant does not "give rise to new substantive terms that do not otherwise exist in the contract."  *Mid-America Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 974 (8th Cir. 2005) (quoting *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 700 (8th Cir. 2003)).

As we have already discussed, the 2003 mortgage (the 2001 mortgage was no longer in effect as of 2008) authorized the mortgagee to charge for a flood hazard determination.  But this section of the mortgage

and the determination itself make clear that the determination was for the mortgagee's protection, not the mortgagors'. There was no promise to notify (let alone update) the Bagelmanns concerning their flood zone status, so any allegation of bad faith here lacks a contract term to which it can be attached. We affirm the grant of summary judgment to IBMC on this count.[15]

### IV. Conclusion.

For the above stated reasons, the judgment of the district court is affirmed as to FNB. Regarding IBMC, we affirm as to all counts except negligence (Count 4), where we reverse and remand for further consideration of a possible claim based upon Restatement (Second) of Torts section 551(2).

**JUDGMENT OF THE DISTRICT COURT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS.**

All justices concur except Zager, J., who takes no part.

---

[15]We also affirm the district court's grant of summary judgment on the Bagelmanns' claim for punitive damages. That claim derives entirely from the breach of the duty of good faith and fair dealing claim.